### IN THE U. S. DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

RAVENSWOOD I, L.L.C.;
RAVENSWOOD II, L.L.C.;
WHITEWOOD L.L.C.

VS.

CITIGROUP, INC.; CITICORP;
CITIBANK, N.A.; CITICORP NORTH
AMERICA, INC.; SALOMON SMITH
BARNEY, INC.; JPMORGAN CHASE
& COMPANY; CREDIT SUISSE FIRST
BOSTON, INC.; CREDIT SUISSE FIRST
BOSTON, LLC; CREDIT SUISSE
FIRST BOSTON (USA) INC.;
PERSHING, LLC; MERRILL LYNCH
& COMPANY; MERRILL, LYNCH,
PIERCE, FENNER & SMITH, INC.;
DEUTSCHE BANC ALEX. BROWN;
DEUTSCHE BANC ALEX. BROWN,
INC.; DEUTSCHE BANK
SECURITIES, INC.

§`
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

United States Courts
Southern District of Texas
FILED

NOV 3 0 2004

Michael N. Milby, Clerk of Court

# H-04-4520
C.A. NO. _____;

**JURY DEMANDED**

## COMPLAINT

Plaintiffs Ravenswood I, L.L.C, Ravenswood II, L.L.C. and, Whitewood, L.L.C. (collectively, "Plaintiffs"), as successors in interest in certain securities purchased by The Prudential Insurance Company ("Purchaser"), bring this action against Citigroup, Inc.; Citicorp; Citibank, N.A.; Citicorp North America, Inc.; Salomon Smith Barney, Inc.; JP Morgan Chase & Company; Credit Suisse First Boston, Inc., Credit Suisse First Boston, LLC; Credit Suisse First Boston, (USA) Inc.; Pershing, LLC; Merrill Lynch & Company; Merrill, Lynch, Pierce, Fenner & Smith, Inc.; Deutsche Banc Alex. Brown; Deutsche Banc Alex. Brown, Inc.; Deutsche Bank Securities, Inc. (collectively, "Defendants" or the "Banks").

## PARTIES[1]

1.      Plaintiffs Ravenswood I, L.L.C. and Ravenswood II, L.L.C. are both organized under the laws of Massachusetts each has its principal place of business in Massachusetts.

2.      Plaintiff Whitewood, L.L.C. is organized under the laws of New York with its principal place of business in the State of New York.

3.      Defendant Citigroup, Inc. is a Delaware corporation with its principal place of business at 399 Park Avenue, New York, New York 10043.

4.      Defendant Citicorp is a Delaware corporation with its principal place of business at 399 Park Avenue, New York, New York 10043.

5.      Defendant Citibank, N.A, Inc. is a national bank with its principal place of business at 399 Park Avenue, New York, New York 10043.

6.      Defendant Citicorp North America, Inc. is a Delaware corporation with its principal place of business at 450 Mamaroneck Avenue, Harrison, New York 10528.

7.      Defendant Salomon Smith Barney, Inc is a New York corporation with its principal place of business at 388 Greenwich Street, New York, New York 10013 and is at times referred to herein as "Salomon."

8.      Defendants Citicorp, Citibank, N.A., Inc., Citicorp North America, Inc., and Salomon Smith Barney, Inc. are all predecessors in interest or wholly-owned subsidiaries of Citigroup, Inc. and are herein collectively referred to as "Citigroup", "Citi" or "Citigroup/Salomon."

9.      Defendant JP Morgan Chase & Company, referred to herein as "JPM", is a

---

[1] Purchaser The Prudential Insurance Company is an insurance company with its principal place of business in New Jersey.

2

national banking institution incorporated under the laws of the State of Delaware and maintains its principal executive offices at 270 Park Avenue, New York, New York.

10.     Defendant Credit Suisse First Boston, Inc. is a Delaware corporation with its principal place of business at Eleven Madison Avenue, New York, New York 10010.

11.     Defendant Credit Suisse First Boston, LLC, is a Delaware corporation with its principal place of business at Eleven Madison Avenue, New York, New York 10010.

12.     Defendant Credit Suisse First Boston (USA), Inc. is a Delaware corporation with its principal place of business at Eleven Madison Avenue, New York, New York 10010.

13.     Defendant Pershing, LLC is a Delaware corporation with its principal place of business at 2711 Centerville Road, Suite 400, Wilmington, DE 19808.

14.     Credit Suisse First Boston, Inc., Credit Suisse First Boston, LLC, Credit Suisse First Boston (USA), Inc., Donaldson, Lufkin & Jenrette Securities Corporation, and Pershing, LLC are affiliated entities herein collectively referred to as "CSFB" or "Credit Suisse," or "Credit Suisse/DLJ."   Donaldson, Lufkin & Jenrette, a CSFB predecessor in interest, is referred to herein as "DLJ" or by the collective "CSFB" name.

15.     Defendant Merrill Lynch & Company, Inc. is a Delaware corporation with its principal place of business at 4 World Financial Center, New York, New York 10080.

16.     Defendant Merrill, Lynch, Pierce, Fenner & Smith, Inc. is a Delaware corporation with its principal place of business at 4 World Financial Center, New York, New York 10080.

17.     Defendants Merrill Lynch & Company and Merrill, Lynch, Pierce, Fenner & Smith are affiliated entities collectively referred to herein as "Merrill Lynch" or "Merrill."

3

18.     Defendant Deutsche Banc Alex. Brown is a Delaware corporation with its principal place of business at 60 Wall Street, New York, New York 10005.

19.     Defendant Deutsche Banc Alex. Brown, Inc. is a Delaware corporation with its principal place of business at 60 Wall Street, New York, New York 10005.

20.     Defendant Deutsche Bank Securities, Inc. is a Delaware corporation with its principal place of business at 60 Wall Street, New York, New York 10005.

21.     Deutsche Banc Alex. Brown, Deutsche Banc Alex. Brown, Inc. and Deutsche Bank Securities, Inc. acted in concert with respect to the conduct complained of herein and are collectively referred to as "Deutsche Banc."

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over the parties and subject matter of this cause.

23.     The amount in controversy is within the jurisdictional limits of this Court.

24.     Plaintiffs claims against Defendants are similar to those that the Court has ruled are subject to federal "related to" bankruptcy jurisdiction pursuant to 28 U.S.C. § 1334.

25.     All Defendants regularly and systematically transact business in the State of Texas and a substantial part of the conduct of each Defendant complained-of herein occurred in the State of Texas.

26.     Venue is proper in the Southern District of Texas because a substantial part of the events or omissions giving rise to the claims occurred in Houston, Texas. Not only is venue proper pursuant to 28 U.S.C. § 1391, but a consolidated Enron-related proceeding arising from many of the same operative facts and occurrences raised in this action is pending in the Southern District of Texas.

4

## NATURE OF THE CASE -- OVERVIEW

27.     Defendants are large, global financial services banks and their affiliates.  For pecuniary gain, Defendants wrongfully conspired with Enron and with each other to aid and abet fraud by actively helping Enron conceal its true financial condition.

28.     Each   Defendant,   often   through   wholly-owned   subsidiaries,   devised, implemented and/or participated in complex sham transactions that allowed Enron to falsify its publicly disseminated financial statements.  Each Defendant, as a result of its intimate relationship with Enron and Enron's top officers, knew Enron's true and precarious financial condition but nonetheless aided Enron in perpetrating its fraud.

29.     Not only did they help Enron cook its books by devising transactions that concealed Enron's true financial condition, Defendants aided Enron's scheme by repeatedly recommending the purchase of Enron securities to the investing public.   Defendants consistently recommended Enron securities as a "buy" or "strong buy" even as Enron was descending into bankruptcy in late 2001.

30.     In return for their participation in Enron's scheme, the Banks received huge fees and other special financial favors totaling hundreds of millions of dollars.  The Banks' executives, through wholly owned subsidiaries or partnerships, also personally profited by being allowed to in at least one sham entity with guaranteed high rates of return.

31.     Purchaser bought the Enron debt securities at issue in this action (the "Notes") in May 2001.  Sale of the Notes closed in Houston, Texas.  Purchaser's decision to purchase the Notes was based upon the fraudulent financial reports Defendants helped create.  The fraud was further perpetrated by a steady stream of reports from Defendants' analysts praising

5

Enron as a well managed and financial sound company. When Enron filed for bankruptcy protection in early December 2001, the value of the Notes plunged.

## FACTS

32.      Enron was originally an energy company with operations focused in the natural gas industry.    In 1997, Enron launched an ambitious and aggressive program of diversification and expansion. Enron's expansion plans were capital intensive and Enron needed increasingly large amounts of "fresh" money to fund its operations.

33.       Defendants helped finance this expansion by raising money for Enron from the investing public. Defendants were involved in numerous offerings of Enron common stock, Enron debt instruments, and other Enron-related registered and unregistered securities. As part of their "due diligence" for underwriting Enron offerings, Defendants gained knowledge of Enron's true financial condition.

34.      Starting in 1998-1999, Enron's actual performance began lagging analysts' expectations. Enron became concerned that failure to meet analysts' expectations would negatively impact Enron's share price and hamper its ability to continue borrowing at favorable interest rates.

35.      As a "solution" to this problem, Enron implemented a giant Ponzi scheme: Enron would raise fresh cash to pay interest charges on old debt, cover losses and finance ongoing operations. To convince investors to keep lending money, Enron would cook its books to give investors the impression that the company was in sound financial condition.

36.      Enron needed the aid of investment banks to perpetrate this scheme. Enron was a substantial source of income for Defendants and Enron warned Defendants that future business would be withheld from any Bank that refused to participate on Enron's terms. Not

wanting to lose the huge fees generated from Enron's business, Citigroup, JPM, CSFB, Merrill Lynch and Deutsche Banc each decided to assist Enron in implementing and perpetrating its fraudulent scheme.

37.     A critical element of the scheme was Enron's investment-grade credit rating, which depended upon financial reports indicating strong current results and containing optimistic financial forecasts.  Defendants obliged by helping Enron "cook the books."  To this end, Defendants structured various transaction and special purpose entities ("SPEs") to make Enron look financially stronger and more profitable than actually was the case.  These Bank-devised transactions were designed to make loan proceeds appear as revenue, to shift liabilities off of Enron's consolidated financial statements, and to temporarily enhance reported cash flow at the end of accounting periods.

38.     Defendants further aided Enron's fraud by continually recommending the purchase of Enron and Enron-related equity and debt instruments to the investing public. When an analyst employed by one of the Banks issued a less than glowing assessment of Enron, the analyst was fired.

39.     Amazingly, even as Enron's problems were coming to light throughout 2001, Defendants' analysts kept recommending the purchase of Enron securities.

40.     At the same time they were recommending the purchase of Enron securities, Defendants increasingly took steps to reduce their exposure to a possible – or probable – Enron collapse.  The Banks shifted their own risk to new investors who were advised by the Banks to invest in the sham schemes and special purpose entities ("SPEs") created to aid Enron in cooking its books.

7

41.     Defendants benefited greatly from the fees and commissions collected in connection with offerings of Enron and Enron-related securities.  Executives of Defendant Banks also profited personally from "special deals."  As long as the scheme continued, Defendants could continue collecting fees for devising new sham transactions and for underwriting new stock or debt issues.

42.     During their course of dealings with Enron, each Defendant developed a close relationship with Enron, and in some cases engaged in energy transactions directly with Enron.  From these relationships, from their work on Enron-related projects, and as a result of their due diligence investigations in connection with the syndications of Enron-related debt and equity issues, Defendants knew or learned of Enron's true financial condition and the effect that Defendants' structured projects had in aiding Enron perpetrate its fraud.

43.     Each Defendant Bank participated in numerous transactions to aid Enron perpetrate its scheme.  The Banks' intimate and conspiratorial relationship with Enron was epitomized by the involvement of all Defendants – Citigoup, JP Morgan Chase, Merrill Lynch, Deutsche Bank and CSFB – in the "LJM2" special purpose entity.  This SPE was structured and created in late 1999 as a vehicle for hiding Enron liabilities and allowing Enron to report strong earnings in its year-end financial reports.

44.     Run by Enron's Chief Financial Officer Andrew Fastow, LJM2 was used to complete a number of year-end "deals" which boosted Enron's reported profits.  Enron "sold" a number of "assets" – assets that Enron had been unable to sell to legitimate, bona fide buyers – to the LJM2 entity.  This mixed bag of essentially unmarketable assets included, among other things, majority interests in a Polish power plant and an interest in a

Gulf of Mexico natural gas system. Enron reported a profit on the sales of these assets to LJM2. Later, Enron repurchased the assets.

45.      In other words, Defendants invested in the clandestine SPE, which was controlled by Enron, to facilitate the phony sales of overvalued Enron assets. As a result, Enron and Defendants were able to deceive investors by moving worthless assets and debt off Enron's balance sheet, and thus artificially inflate the value of Enron securities.

46.      The Banks collected substantial fees for their participation in LJM2.

47.      "Select investors" were often promised annual returns of 30% on LJM2 investments. This group of select investors included officers, directors and other key employees of Defendant Banks.

48.      The Banks knew from the start that the structure, the purpose, and Enron's control of LJM2 was improper. LJM2 was devised to purchase assets from Enron. Andrew Fastow, Enron's Chief Financial Officer, controlled and owned (along with his Enron subordinate Michael Kopper) the entity set up by Fastow to be LJM2's general partner. Fastow, accordingly, was charged both with LJM2's management and investment decisions, and with conflicting obligations to pursue and protect Enron's interests.

49.      The inherent conflict of interest between Fastow's role as representative of LJM2's investors and his role as an Enron officer was obvious. Each Defendant nonetheless decided to proceed with the placement of LJM2. The fees generated by the SPE, the high rates of return granted to executives that were allowed to participate as "select investors," and the promises of future Enron business were too enticing to pass up.

50.      After Enron's collapse, Enron's Board of Directors commissioned William Powers to prepare a report concerning the reasons for Enron's sudden demise. The resulting

report, dated February 1, 2002 (the "Powers Report") concluded that the LJM2 disclosures were obtuse, did not communicate the essence of the transactions completely or clearly, and failed to convey the substance of what was transpiring.

51.     Andrew Fastow pleaded guilty, in 2004, to criminal charges arising from the fraud perpetrated by Enron.

52.     LJM2 was only one of the many transactions devised and implemented by Defendants to aid Enron's fraudulent scheme and to allow Enron to report false financial results.

53.     Citigroup, JPM, CSFB, Merrill Lynch and Deutsche Banc each knew that Enron repeatedly promulgated false and deceptive public financial statements and filed untrue financial statements with the Securities and Exchange Commission from 1999 to 2001. Enron could not have promulgated the false financial results, and perpetrated its fraud, without the active assistance of Defendants.

54.     Based upon Enron's false financial statements and Defendants' public representations that Enron was a financially sound company, The Prudential Life Insurance Company decided to purchase the Notes at issue in this action.

55.     Specifically, The Prudential Insurance Company purchased $41,696,505 of 7.5445% Enron Senior Notes Due December 30, 2015 and $73,828,459 of 7.02385% Senior Notes Due June 30, 2015.  Pursuant to the Notes' terms, the sale occurred in Houston, Texas on May 30, 1991.

56.     Interests in the Notes, including the right to assert claims under the Notes, have passed to Plaintiffs.

57.     At the time Notes were sold in late May 2001, Defendants were becoming increasingly concerned about their own exposure to Enron and were reducing their exposure to Enron.

58.     In mid-October 2001, Enron announced its third quarter 2001 earnings.  The announcement included an unexpected "non-recurring" charge against earnings of approximately $1 billion "related to losses associated with certain investments, principally Enron's interest in The New Power Company, broadband and technology investments, and early termination during the third quarter of certain structured finance arrangements with a previously disclosed entity."

59.     On October 16, 2001 a Wall Street Journal article questioned the propriety of LJM2.  The article noted that LJM2 had engaged in billions of dollars of complex hedging transactions with Enron, involving company assets and millions of shares of Enron stock, but that it was not clear from Enron's Securities and Exchange Commission filings what Enron received in return for providing these assets and shares.

60.     The Wall Street Journal next reported that "Enron ... shrank its shareholder equity by $1.2 billion as the company decided to repurchase 55 million of its shares that it had issued as part of a series of complex transactions with an investment vehicle" connected to Chief Financial Officer Andrew Fastow.  This repurchase was necessitated by Enron's "guaranty" to the illicit SPE that the value of Enron stock, a primary asset of the special purpose entities, would remain above a specified value.

61.     On October 22, 2001, Enron announced that the Securities and Exchange Commission had requested Enron to voluntarily provide information about LJM2

11

transactions.  Two days later, Enron announced that Fastow would be on a leave of absence and would be replaced as CFO.

62.    Throughout October 2001, Defendants continued to recommend the purchase of Enron securities to the investing public.

63.    Enron announced on November 8, 2001, that it would restate its financial results for 1997, 1998, 1999, 2000 and interim 2001 to include in its consolidated financial statements the partnerships which CSFB and Deutsch helped devise and promote.

64.    Enron descended into bankruptcy on December 2, 2001, filing its bankruptcy petition in the Southern District of New York.

65.    Plaintiffs seek to recover damages incurred as a result of Defendants' wrongful conduct.

**Citigroup**

66.    Citigroup, through its subsidiaries and divisions, provided commercial and investment banking services, commercial loans and advisory services to Enron.  These advisory services included aid in devising and implementing various derivatives and hedging transactions that aided Enron in disseminating false financial reports.

67.    During 1997-2001, Citigroup completed over sixty transactions with Enron, an average of more than one per month.

68.    Between 1997 and 2001, Citigroup's Enron-related income steadily increased from $16.8 million in 1997 to $61.6 million in 2001.  In total, Citigroup received approximately $188 million in revenue related to Enron transactions during the period 1997 through 2001.

12

69.     In an internal "Revenue Memo" dated September 2001, Citigroup acknowledged that "[o]ver the last three years, Enron has grown to be one of the highest revenue clients within Citigroup."

70.     As a so-called "tier 1 bank." Citigroup was one of Enron's primary fundraisers. Citigroup executives and employees were in daily, or almost daily, contact with Enron executives.

71.     In an Enron "Relationship Review," dated July 2000, Enron wrote that Citigroup was the "primary banking relationship for Enron in 1999.  They lined up perfectly with us – we should reward this structure."

72.     Citigroup helped raise billions for Enron from the investing public through the sale of securities; was involved in devising improper SPEs that were used to inflate Enron earnings and conceal debt; and made disguised loans to Enron which allowed Enron to fraudulently report proceeds from loans as "operating income."

73.     Citigroup was a lead Bank in implementing LJM2.

74.     Citigroup was also involved in a scheme known as "The New Power IPO" in October 2000.  With other Banks, Citigroup made a loan to the Enron-related SPE named "Hawaii 125-0", and received a "total return swap" guarantee to protect it from any loss.  At the same time, Enron sold New Power warrants to that sham entity and falsely hedged them with the help of other Enron-controlled entities, including LJM2.  This transaction was used to manipulate Enron's reported financial results.

75.     Citigroup's pre-paid swaps or "prepays" probably comprise the largest set of fraudulent transactions in the entire Enron fiasco.  These transactions, on their face, appeared as commodity transactions.  In reality, they were disguised loans to Enron totaling billions of

dollars that were never disclosed on Enron's balance sheet. Enron was thus able to show income it never received. In testimony before Congress, Citigroup/Salomon officials could not explain any legitimate business reason for devising these transactions.

76.     According to a report prepared by the United States Senate Subcommittee on Investigations, Citigroup led fourteen separate prepay transactions that provided Enron with approximately $4.8 billion between 1992 and 2001. The return on these loans, at interest rates nearly double the normal borrowing rate, provided Citigroup with substantial incentive to conceal the truth about Enron's true financial condition.

77.     That Citigroup devised these prepays, knew precisely how these transactions worked, and received millions of dollars in revenue as a result of its aid to Enron between 1997 and 2001 cannot genuinely be disputed. The records concerning the prepaid transactions, as well as the fees and interest "earned" by Citigroup from Enron, are now a matter of public record.

78.     The prepays were devised for the sole purpose of misrepresenting Enron's financial condition. The deceptive structure was employed to conceal the improper purpose. An internal Citigroup email dated September 9, 2000 states that "Enron gets money that gives them c[ash] flow but does not show up on the books as big D Debt."

79.     To implement the prepay scam, Citigroup created an SPE named "Delta." The role of Delta was that of a "third party" to the prepay transactions. None of the Citigroup officers interviewed by the United States Senate Subcommittee on Investigations could explain any purpose for Delta other than entering into prepay contracts. Delta, simply put, had no legitimate business purpose because Delta was, in fact, an alter ego of Citigroup.

80.     Delta was created by Citigroup for the sole purpose of concealing the genuine character of the transactions and, by doing so, deceiving investors.  Although Delta appeared technically to be a legally separate entity from Citigroup, the facts surrounding its creation, operation and control prove otherwise.

81.     Specifically, Delta (a Cayman Islands entity) was acquired by Salomon.  Delta apparently had no physical office or staff for engaging in oil and gas trading.  Delta, moreover, did not engage in any business that was not related to Citibank.  Rather, Delta only participated in prepay transactions that included Citigroup.

82.     Citigroup employee Richard Caplan, in a sworn statement dated April 22, 2003, stated that Delta had only about $1,000 in net assets, representing the pre-funding of directors fees and its initial capitalization.  Thus Delta, capitalized with only about $1,000, plainly could not have properly participated in trading activity the size of the prepay deals without other financing.  Citigroup had complete control of the Delta SPE.

83.     A CBS Market Watch segment, on July 30, 2002, reported on then-upcoming Congressional hearings pertaining to Citigroup's involvement with Enron and with Enron's demise.  Barbara Yastine, chief financial officer of Citigroup's corporate and investment bank, apparently was appointed to act as Citigroup's defender before the press.  Yastine nonetheless conceded that, at the time Delta was formed, Citibank contemplated that SPEs such as Delta would only be involved in transactions that included Citibank.  Yastine also acknowledged that Citibank had paid "some administrative and legal fees for Delta" and that Citibank's relationship with Delta "might seem to imply some level of control."

84.     In the earlier prepay transactions, Citigroup served as a source of funds that went through Delta and on to Enron.  Later, as this financing game became a Ponzi scheme,

Citigroup no longer wanted to take the risk of lending money to Enron.  Starting in 1999, Citigroup financed the prepays through bond offerings.

85.     "Yosemite" was the name given to a series of six synthetic Enron bond offerings that were used to raise $2.4 billion for prepay transactions during 1999-2001.  Specifically, Yosemite I was issued on November 18, 1999 to raise $750 million; Yosemite II was issued February 2, 2000 to raise £ 200 million; Yosemite III (issued as Enron CLN-I -Credit Link Note) was issued August 17, 2000 to raise $500 million; and Yosemite IV (issued as Enron CLN II) was issued May 17, 2001 and comprised three offerings:   $500 million, £ 125 million, and 200 million euros.

86.     For Yosemite offerings, an "off-balance sheet" trust offered "credit linked obligations" -- notes linked to Enron's credit.  By raising the funds for the prepays in this fashion, the investors rather than Citigroup took on the risk that Enron would not or could not repay the funds.  No additional means of credit support, such as surety bonds or letters of credit, were employed.

87.     An internal Citigroup credit approval memorandum regarding Project Yosemite states, "The purpose of the Yosemite transaction is to enable Enron to create additional credit capacity for itself in the bank market by shifting Enron credit risk from the bank market to the capital markets without affecting existing rating agency and accounting treatment of the Enron Structured Debt."

88.     These credit linked notes also provided the secrecy desired by Enron and Citigroup.  The purchasers of the credit linked notes were not told how their investments were being used.  Thus the nature of the investments was kept secret because, in Citigroup's words, the lack of specific information operated as a "black box."

16

89.     In material promoting the Yosemite prepays, Enron proclaimed that Yosemite "provides a unique 'black box' feature [that] provides considerable flexibility" and that the "[b]lack box allows Enron the ability to provide a permanent take-out feature for highly structure[d] transactions in the capital markets while limiting disclosure of prepay to Citibank."

90.     A senior account at Citigroup, Saul Bernstein, concluded that Enron should have consolidated on its balance sheet the Yosemite I and Yosemite II entities that issued the notes.  Such accounting treatment would have resulted in Enron having to report as debt on its balance sheet the $1.1 billion proceeds from Yosemite I and II.  Despite knowing that the prepays would allow Enron's desired, fraudulent accounting of the transactions, Citigroup nonetheless elected to continue with the Enron prepay transactions.  Citigroup's position, according to Bernstein:  "the issue was the customer's risk to accept or reject."

91.     Citigroup thus devised these transactions in a way that allowed Enron to report vastly exaggerated earnings.  By privately placing securities and only revealing some of the facts about the nature and structure of Yosemite, Citigroup was able to conceal from investors how Enron used the proceeds, thus further shielding the prepay transactions from scrutiny.

92.      In explaining to investors its rationale for secrecy, Citigroup insisted that the investors must be kept in the dark because the use of prepays as a monetization tool is a sensitive topic for the rating agencies, for the banks and for many institutional investors.

93.      Enron's court-appointed bankruptcy examiner Neal Batson determined, in agreement with Mr. Bernstein's assessment, "with respect to the credit linked portions of

Yosemite I and II, which Citigroup designed, there is evidence that Citigroup knew Enron's accounting was not in compliance with GAAP."

94.    In addition to Yosemite, Citibank participated a number of other large prepay transactions.

95.    Citigroup devised "Roosevelt," a $500 million prepay transaction.

96.    An internal Citigroup email from Citibank's James Reilly dated April 27, 1999 implicitly acknowledges that the Roosevelt prepay was merely a disguised loan, noting "[t]he papers cannot stipulate that [Enron had agreed to repay the loan] as it would require categorizing the prepaid as simple debt . . . the paperwork cannot reflect their agreement, as it would unfavorably alter the accounting."

97.    Citigroup devised "Truman," another $500 million prepay transaction.

98.    Citigroup devised "Jethro," a $675 million transaction which refinanced and extended Truman.

99.    Citigroup devised "Nixon," a prepay for $374 million.

100.   Citigroup devised an additional prepay transaction in June 2001 for $250 million.

101.   Citigroup also helped Enron devise and implement other deceptive SPE transactions designed to manipulate Enron's financial statements, most significantly Citigroup's minority interest transactions called "Nahanni," "Nighthawk" and "Rawhide," and two forest products transactions called "Bacchus" and "Sundance Industrial."

102.   In legitimate minority interest transactions, a company raises capital by selling a minority equity interest in one of its consolidated subsidiaries to an unrelated entity that is not consolidated in the selling company's balance sheets.   The Enron minority interest

transactions, however, were shams because the minority interest "purchaser" was not an unrelated entity; it was a sham entity devised for a circular flow of funds.

103.    In Nahanni, Enron completed a minority interest transaction in which the minority investor contributed $500 million of treasury securities in an Enron subsidiary, Enron classified these securities as "merchant investments," and Enron promptly sold them and reported the proceeds as cash flow from operating activities.

104.    Nahanni was a year-end deal designed for the sole purpose of boosting year-end reported profits.  Enron completed the transaction in December 1999 and repaid the debt in mid-January 2000.  There was no rational business purpose for the transaction, including no business purpose related to a temporary need for cash.

105.    In an undated document titled "Citigroup Exposure Spreadsheet," Citigroup acknowledged that "Enron has used Nahanni only for year-end window dressing . . ."  In an email dated July 24, 2001 from James Reilly, one of Citigroup's Enron relations manager to Michael Nepveux, Reilly described Nahanni as "essentially, an insurance policy for YE balancing."

106.    Citigroup designed the Nahanni structure and recommended that Enron use treasury securities in the transaction.  Nahanni represented 41% of Enron's total reported cash flow from operating activities for 1999.

107.    Nighthawk was another year end transaction.  This 1997 minority interest transaction devised by Citigroup raised $500 million for Enron.  The purpose: to augment Enron's reported cash flow from operations.

108.    In a memorandum to file dated December 15, 1997, a senior Citigroup accountant evaluating Nighthawk concluded that, because the equity of the minority interest

investor was not at risk, Enron would be required to consolidate the investor equity on its balance sheet. Such consolidation would have required Enron to report the $500 million as debt rather than as a minority interest investment.

109.     Citigroup designed the Nighthawk structure and knew that, as far as Enron was concerned, the minority interest was the key factor. Citigroup, in other words, knew that Nighthawk was to be used by Enron to manipulate and falsify its reported financial results.

110.     Citigroup washed its hands of any risk involved with ownership of Nighthawk assets by transferring the risk to private investors. Citigroup dumped these overpriced assets into another SPE scheme, call Osprey, that Citigroup helped underwrite.

111.     Citigroup helped promote the 1999 Osprey I offering involving the sale of $1.4 billion in 8.31% Senior Secured Notes due January 15, 2003 and $100 million of beneficial ownership Osprey Trust Certificates.

112.     The Osprey offering was privately placed. The offering documents and promotional material included virtually no information about the assets to be purchased, the investors thus forced to rely on the due diligence performed by Citigroup and the other underwriters.

113.     The Osprey I offering documents included overt misrepresentations. For example, the offering memorandum falsely stated that Enron assets would be purchased by means of "arms length negotiations."

114.     The offering memorandum also omitted to disclose Citigroup's conflict of interest. Investors were told that funds would be used to purchase assets from an "undisclosed" entity. It was well known to the Osprey underwriters, however, that this entity was Citigroup's "Nighthawk" SPE.

115.    Thus, Citigroup omitted to disclose a conflict of interest, aided and abetted Enron's fraud, and conspired with CSFB and Deutsche, the two banks that jointly devised the transaction and were the Osprey I book running managers.

116.    Rawhide, another minority interest transaction involving a secret loan of $750 million in December 1998 used to boost Enron's reported year-end revenue and profits.

117.    An internal Citibank memorandum dated January 6, 2000 acknowledged that the Rawhide transaction was actually a loan:  "we [Citibank] now have recourse to Enron in an amount of 100% of the Rawhide Debt."  Citigroup accordingly knew that Enron's financial statements characterizing Rawhide as a minority interest rather than a loan was materially false.

118.    The Bacchus transaction had the effect of allowing Enron to borrow $200 million "off the books" for year 2000 financial reporting manipulations.  Enron sought to inflate its earnings in order to meet analyst expectations.

119.    Citigroup knew, at the time, the transaction was improper and would be improperly reported by Enron.  Internal email dated November 24, 2000 from Steve Ballie to William Fox and others acknowledge there were "key concerns" about the "appropriateness" of the "earnings dimensions to this deal."

120.    An internal Citigroup memorandum dated December 6, 2000 reveals that Enron, through Fastow, provided Citigroup with verbal assurances that Enron would support Citigroup's "equity" portion of the transaction.  In accordance with GAAP accounting standards, Enron should have, but did not, consolidate the transaction on its balance sheet because of this guaranty.

121.    Citigroup director Steve Wagman wrote, in an internal email dated December 27, 2000, "Sounds like we made a lot of exceptions to our standard policies.  I am sure we have gone out of our way to let them know we are bending over backwards for them . . . let's remember to collect this iou when it really counts."

122.    The Sundance Industrial transaction had the effect of selling all of Enron's forest product assets at inflated prices into a nonconsolidated partnership.  These assets, and their significant associated debt, were thus kept off of Enron's consolidated balance sheet.

123.    Citigroup's Lynn Feintech, in an internal email dated May 15, 2001, wrote that, from Enron's perspective, Sundance was "a funky deal (accounting wise)."

124.    Minutes from a Citibank committee meeting and a memorandum resulting from the meeting acknowledge, "The investment has been structured to act like debt in form and substance."

125.    In a memorandum regarding Enron-Project Sundance Transaction dated May 30, 2001, Citigroup's Dave Bushnell wrote, "the GAAP accounting is aggressive and a franchise risk to us if there is publicity (a la Xerox)."

126.    An October 2001 internal Citigroup email from Rick Caplan (of the Salomon Smith Barney derivatives group) to William Fox (managing director of the Citibank Global Power Energy Group) referenced the guaranty that required Enron to consolidate the transaction:  "This transaction is structured to safeguard against the possibility that we need to contribute our contingency fund and to ensure there is sufficient liquidity at all times to repay our $28.5 million investment."

127.    In other words, all concerned with Sundance knew that the substance of the transaction was a loan and that Enron was improperly using the transaction to cook its books.

128.     By participating in many of Enron's SPE transactions, Citigroup violated or ignored its own guidelines for appropriateness.     According to Citigroup's internal rules, several areas were to be reviewed and approved for each of the SPE transactions by a "Designated Responsible Senior."

129.     William T. Fox, head of Citigroup's Global Energy and Mining Group during 1999-2000, testified before the Enron bankruptcy examiner that Citigroup had and continues to have a policy of requiring that all its structured transactions meet an appropriateness standard.     The Project Nighthawk Transaction Approval Package of December 1997 contained a copy of the Appropriateness Test Questionnaire.

130.     One area of "appropriateness" to be examined: "Lack of transparency (business objective) – The true economic substance of the transaction cannot be determined from the structure." The prepays, however, were specifically designed to hide the fact that supposed derivative transactions were, in fact, loans.  Other transactions likewise lacked transparency.

131.     Another "appropriateness" consideration: "Secrecy of identity of true party – The true identity of a party to the transaction cannot be determined because of the use of SPVs or charitable trusts in offshore tax havens or bank secrecy jurisdictions." The Delta SPE, however, was used to conceal that Citigroup, rather than Delta, was a true party to the transaction.

132.     Still another item on the "appropriateness" checklist: "Disproportionate impact – The transaction will have a significant impact on the customer's financial condition or results, and will not be required to be disclosed." The off-balance sheet prepays and SPEs, however, had a material effect on Enron's financial statements  For example, for the year

1999, 76% of Enron's net reported cash flows from operating activities was the result of these manipulative prepay transactions.

133.    As a reward for devising prepays and other structured deals, Citigroup was allowed to act as an underwriter for numerous other Enron Corporation and Enron-affiliated securities issues.

134.    Citigroup's participation in these transactions not only yielded substantial income, but also provided Citigroup with additional insight and knowledge of Enron's true financial condition.

135.    Enron rewarded Citigroup by allowing Citigroup to underwrite numerous Enron and Enron-related securities offerings.

136.    Along with Deutsche Banc, DLJ and others, Salomon Smith Barney acted as an underwriter in connection with a March 1, 2000 offering of $1,400,000,000 of 8.31% Senior Secured Notes due 2003 and Enron Corp. Mandatory Convertible Junior Preferred Stock, Series B, in connection with Enron's investments in the Marlin and Atlantic Water Trusts.

137.    Salomon participated as an underwriter in connection with the October 5, 2000 initial public offering (IPO) of 24 million shares of TNPC, Inc. an Enron-affiliated entity and parent company of The New Power Company.

138.    On or about August 11, 1999, Enron Oil & Gas and Enron offered 27,000,000 shares and 4,000,000 shares, respectively, of Enron Oil & Gas common stock, in conjunction with an offering of Enron's exchangeable notes, convertible to shares of Enron Oil & Gas stock.  Salomon acted as an underwriter in connection with the stock and note sale in this combined public offering.

139.    Salomon was an underwriter, along with CSFB entities and Lehman Brothers, of a $744 million public offering on or about February 12, 1999, of 12 million shares of Enron common stock at $62 per share.

140.    Salomon acted as co-underwriter for a public offering in December, 1998 of $250,000,000 of Enron Floating Rate Notes due March 30, 2000.

141.    Salomon acted as co-lead underwriter for a public sale of Enron Oil & Gas Co. 6.00% Notes due 2008.

142.    Salomon Brothers, Inc., predecessor to Salomon Smith Barney Inc., acted as co-lead underwriter with UBS Securities in a public offering dated on or about November 14, 1997, of $300 million of Enron Corp. 6.45% Notes due November 15, 2001.

143.    Smith Barney, Inc., acted as sole underwriter in a public offering dated on or about November 14, 1997, of $150 million of Enron Floating Rate Notes due November 18, 1999.

144.    Citigroup was co-lead underwriter in a public offering dated August 5, 1997, of $150 million Enron 6.5% Notes due August 1, 2002.

145.    Citigroup acted as co-lead underwriter with Merrill Lynch in a public offering on or about January 13, 1997, of 6 million shares of Enron Capital Trust II 8⅛% Trust Originated Preferred Securities at $25 per share.

146.    The commissions, fees and interest received by Citigroup (and its executives) as payment for Citigroup's fraudulent conduct were huge and provided a powerful incentive for Citigroup to continue to aid and abet the fraud perpetrated by Enron

147.    At the same time it was foisting billions of dollars of Enron debt upon an unsuspecting public, Citigroup was reducing its own risk exposure by such means as transfer of the "Nighthawk" SPE.

148.    Citigroup repeatedly issued analyst reports containing false and misleading statements touting Enron's solid financial condition.  In approximately sixteen analyst reports issued between October 1998 and October 2001, Citigroup portrayed Enron as a financially sound, well-managed company and recommended Enron equities as a "buy" or "strong buy".  These reports were issued on October 22, 1998, January 27, 1999, May 25, 1999, July 20, 1999, August 20, 1999, September 20, 1999, April 12, 2000, September 21, 2000, March 12, 2001, March 22, 2001, May 18, 2001, June 7, 2001, July 13, 2001 October 16, 2001 and October 19, 2001.

149.    The misleading analyst reports aided Enron in artificially maintaining inflated prices for Enron Corporation and Enron-affiliated equity issues.  They also supported the investment-grade credit rating Enron needed to continue its borrowing spree through the issuance of debt.

150.    James Reilly, one of Citigroup's key relationship managers, testified that in November 2001, when Enron disclosed its true liquidity position, Citigroup was not surprised by any of the disclosures.

151.    In short, with full knowledge of the facts, Citigroup aided and abetted Enron's dissemination of fraudulent financial information.

152.    Purchaser, and thus Plaintiffs, was harmed by Citigroup's wrongful conduct.

**JP Morgan Chase & Co. ("JPM")**

153.     Enron considered JPM another "tier 1" bank.  Through its intimate relationship with Enron and the constant contacts between JPM's Houston-based employees and Enron executives, JPM at all times knew Enron's true financial condition.  Until Enron filed for bankruptcy protection, JPM continued to aid Enron in cooking its books by creating various special purpose entities, by devising sham transactions to hide Enron's debt, and by knowingly misrepresenting Enron's true financial condition.

154.     JPM raised billions of dollars for Enron, with JPM's institutional and retail brokerage divisions disseminating glowing reports about Enron's excellent financial condition.  In return for its aid, JPM received from Enron tens of millions of dollars in underwriting and consulting fees, interest on loans and various other management fees.  Further, JPM's top level executives were granted opportunities to invest in Enron special purpose entities such as LJM2 through various corporate shields including, but not limited to, Chemical Investors, Inc., JPMorgan Partners and 60 Wall Street Fund L.P.

155.     JPM's involvement in Enron's scheme to deceive investors is exemplified by what have become known as the "Mahonia prepay transactions."  The Mahonia scheme was one of the largest in the entire Enron debacle.  Enron and its key employees Lay, Skilling, Fastow, Causey and Buy, conspired with JPM to obtain loans that were deceptively structured and represented as commodity trades ("Forward Sale Contracts") through a JPM-controlled offshore entity named Mahonia Limited.

156.     Mahonia was set up on the British Channel Island of Jersey in the early 1990's.  Its "trading" with Enron almost exclusively comprised year-end transactions, with the

purported commodity "deliveries" sold back to those who "delivered" them through complex derivative transactions.

157.    Mahonia was supposedly an "independent" entity, but in reality was merely part of JPM.

158.    JPM knew the intended purpose of these transactions and knew that Enron was not properly reporting the transactions in its financial statements.  Despite knowing Enron's highly dubious business and accounting practices, JPM facilitated, participated in, and perpetuated Enron's fraudulent transactions, while at the same time creating a market for Enron-related securities through its institutional and retail investment branches.

159.    Initially, the purpose of these year-end transactions was management of Enron's tax liabilities by transferring losses from one financial reporting period to another.  Later, these transactions became a substantial means of aiding Enron to cook its books.

160.    Between 1998 and 2001, the amount of funds involved in the Mahonia transactions skyrocketed.  Initially, the Mahonia transactions would commence with JPM "paying" (loaning) Enron between $150 million and $250 million, purportedly for the future delivery of natural gas or crude oil.  The transactions were structured to appear as trades, not as loans.

161.    Beginning in 1998, Enron business with Mahonia increased to include "trades" as large as $650 million.  If JPM had ever doubted the impropriety and fraudulent nature of the Mahonia transactions, by 1998 JPM knew from the marked increase in trades that Enron no longer sought the funds solely for tax avoidance, but instead was actively using the arrangement to falsify its reported financial results.

162.     Documents relating to the Mahonia transactions confirm JPM's deceptive conduct.     In each of the Forward Sale Contracts between Enron and Mahonia, JPM represented that it was merely an agent for Mahonia.  For example, in the "Advance Payment Supply Surety Bond" issued by Liberty Mutual Insurance Company, dated December 18, 1997, in the amount of $255,760,000.00, JPM's only stated involvement was as an agent, "The Chase Manhattan Bank, for and on behalf of Obligee."  A surety bond purchased in conjunction with the transaction required payment to be made to The Chase Manhattan Bank and written notice to be sent to "Mahonia Limited, 22 Grenville Street, St. Helier, Jersey, Channel Islands JEA 8PX, attention Ian James with copy to The Chase Manhattan Bank, 270 Park Avenue, 8th Floor, New York, New York 10017, to the attention of Alex Mintcheff."

163.     JPM never disclosed that it had a financial interest in, and exercised complete control over, Mahonia.  According to a document entitled "Security Agreement Between Mahonia Limited and The Chase Manhattan Bank," JPM maintained a "lien and security interest in the whole of the Company's [Mahonia] undertaking and assets, present and future."  Thus, unlike traditional agents who merely represent their principals in transactions, JPM had a security interest in the entirety of Mahonia's assets.

164.     The Forward Sale Agreement at the heart of many of the Mahonia transactions, known as the "Chase Gas Agreement," provided:

> The Bank has entered into a Natural Gas Forward Sale Contract dated as of the date hereof with the Company pursuant to which the Bank has agreed to purchase certain volumes of natural gas from the Company for forward delivery in exchange for the payment therefore, on a discounted price basis, on June 29, 2000 in a principal amount not exceeding $650,000,000 (as amended, supplemented and modified and in effect from time to time, the "Chase Gas Agreement").

*Security Agreement between Mahonia Limited and The Chase Manhattan Bank, para. 4(b).*

165.    In furtherance of their scheme, Enron and JPM entered into six separate Forward Sales Contracts during 1998 through 2001.  These agreements purported to provide for the delivery of crude oil and natural gas over a 4-5 year period with Mahonia as purchaser.

166.    Under the terms of these Forward Sale Contracts, Enron agreed to provide Mahonia with specified amounts of crude oil or natural gas in consideration for Mahonia's prepay of fixed sums.  Each Forward Sale Contract between Enron and Mahonia contained precise terms for deliveries and replacement deliveries to create the impression that these contracts contemplated and provided for the actual deliveries of crude oil and natural gas.

167.    Mahonia represented in the Forward Sale Contracts that it engaged in the business of reselling crude oil and natural gas and intended to take delivery of crude oil and natural gas in the ordinary course of its business.

168.    Mahonia further represented in the Forward Sale Contracts that it had entered into such contracts in its capacity as a producer, processor, fabricator, refiner or merchandiser of natural gas, crude oil and/or petroleum products.  Based upon the title of the subject contracts and extensive descriptions and specifications set forth therein reflecting the specific terms, dates, locations and amounts of natural gas and crude oil to be delivered, regulators and potential investors were led to believe that the subject contracts were entered for the purpose of actually supplying natural gas and crude oil by Enron to Mahonia.

169.    As part of the deal, Enron acted on JPM's behalf to obtain guarantees, in the form of surety bonds, for the Mahonia transactions.  Between June 29, 1998 and December 28, 2002, Enron turned to eleven insurance companies for these surety bonds.  Not only did Enron arrange these financial guarantees, Enron paid the insurance premiums.

170. These Enron-arranged guarantees were made to render comfort to JPM as the size of the Enron prepay transactions grew.

171. When JPM wanted to collect on these guarantees after Enron sought bankruptcy protection, the insurance companies refused payment, asserting the purported commodity transactions were fraudulent.

172. As Enron's trades grew increasingly larger, financial accounting for these trades became a source of concern within JPM. On August 5, 1999, JPM's Vice Chairman Marc Shapiro and JPM's Senior Credit Officer David Pflug met with other members of JPM's management team to discuss Enron. JPM management decided to reduce its own exposure to Enron. However, JPM also decided to continue aiding Enron in cooking its books by continuing with the prepay transactions and raising cash for Enron from the investing public. JPM was not willing to give up on the lucrative Enron "cash cow" that was so significant to JPM's bottom line.

173. JPM accordingly engaged in a common scheme to utilize Forward Sale Contracts, and the purported derivative transactions and trades between related companies, to mischaracterize Enron's financial condition.

174. Enron's accounting treatment of the Mahonia transactions was not in accordance with the economic substance of the transactions. JPM knew Enron did not provide disclosures in its financial statements or related securities law disclosures that would enable a reader of Enron's financial statements to determine the economic substance of the Mahonia transactions.

175. Enron bankruptcy examiner Batson concluded JPM knew that, in economic substance, the Mahonia transactions were loans to Enron and that Enron was improperly

reporting its obligations under the Mahonia transactions as price risk management liabilities rather than as debt.

176.    In short, JPM knew that Enron's failure to provide adequate and accurate disclosure of the Mahonia transactions resulted in false Enron financial statements.   These false financial reports were disseminated to Purchaser and other members of the investing public, and JPM knew that they were disseminated to the public to commit fraud.   These fraudulent financial reports were filed with the SEC filings, included in Enron's periodic reports to shareholders, and distributed to the news media.

177.    Internal JPM email confirms JPM's detailed understanding of Enron's accounting and disclosure objectives.  In a 1992 internal memorandum written by JPM's Mitchell Taylor around the time Mahonia was devised, Taylor wrote, "The transaction provides a mechanism for Enron to replace long term debt with a trade payable."

178.    Another internal JPM email, from George Serice to Susan Stevens dated October 29, 1997, admits: "These transactions are balance-sheet advantaged and are used as a year-end management tool.  Enron is thus enticed to pay a premium for these transactions."  In yet another internal email from George Serice, but sent to Karen Simon:  "Enron loves these deals as they are able to hide funded debt from their equity analysts because they (at the very least) book it as deferred rev or (better yet) bury it in their trading liabilities."

179.    Donald Layton in an email dated May 12, 1999 declares, "We are making disguised loans, usually buried in commodities or equities derivatives (and I'm not sure in other areas).  With a few exceptions, they are understood to be disguised loans and approved as such.  But I am queasy about the process."

180.    On October 23, 2001, when Enron's financial troubles were becoming publicly known, JPM's Richard Walker forwarded to another JPM employee, Eric Fornell, an email sent by Andrew Fastow to Walker.  Fastow wrote, "I think you know the credit and the business as well as (and better than) anyone in the world, so I'm counting on you to lead the way."

181.    Examiner Batson concluded there was evidence that JPM aided and abetted the cooking of Enron's books and that JPM actively assisted Enron by making misleading representations to Arthur Andersen (Enron's accountant) about the independence of Mahonia.

182.    One participant in a taped telephone conversation on September 13, 2001 among JPM and Enron employees commented that JPM and Enron wanted to make certain that "Mahonia seems independent."

183.    In addition to Mahonia, JPM aided Enron's fraud in many other ways.  JPM, as already noted, also participated in LJM2.

184.    JPM executives profited personally from LJM2 investments, investing almost $25 million through Chemical Investors, Inc.

185.    In a tax-related transaction named "Slapshot," JPM aided Enron in concealing $375 million of off-balance sheet debt.

186.    The substantial income received by JPM for participation in Enron-related transactions, and the handsome reward provided by Enron to JPM executives, explains the motivation for JPM's willing participation in Enron's wrongful scheme.  JPM's annual revenue from Enron business during 1999-2000 was in excess of $20 million.

187.    In order to keep Enron's Ponzi scheme alive, JPM continued to misrepresent Enron's financial condition even after Enron's financial problems were reported in the media.

33

On numerous occasions, including, but not limited to on or about June 9, July 15, September 23, November 26, 1999; January 21, February 9, May 3, May 15, July 3, July 19, September 15, September 27, 2000; March 13, March 23, May 18, June 15, July 10, July 12, August 15, August 17, October 17, October 20, October 23 and November 2, 2001, JPM's institutional and retail investment advisors issued positive ratings on Enron securities.  JPM continued to portray Enron as a financially solid, well-managed company, with full knowledge that the representations were untrue.

188.    Indeed, on October 9, 2001, as Enron's stock price was crumbling, J.P. Morgan Securities issued a report that increased the rating on Enron to a "Top Pick" and listed a target stock price of $90.00 per share.

189.    According to David Welna of National Public Radio news, even as Enron was crumbling, JP Morgan "never did recommend that investors sell their stock."

190.    Damages were incurred as a result of JPM's wrongful conduct.

**Credit Suisse First Boston ("CSFB", "Credit Suisse" or "Credit Suisse/DLJ")**

191.    CSFB provided extensive commercial and investment banking services, commercial loans and advisory services to Enron.  These advisory services, particularly through Donaldson, Lufkin & Jenrette (both prior to and after DLJ's merger with CSFB), included the structuring of special purpose entities and devising esoteric "off the books" financial transactions.  CSFB "relations bankers" had particularly close and intimate relationships with Enron executives.

192.    CSFB devised and helped fund the LJM Cayman SPE.  This transaction ultimately proved to be a "trial run" for the much larger LJM2.

193.    CSFB, like the other Defendants, was involved in the creation and implementation of the LJM2 scheme.  Also like the other Defendants, CSFB knew of the blatant conflicts of interest, the obvious opportunity for self-dealing, and the suspicious promises of extraordinary returns to specially selected investors associated with LJM2.

194.    Credit Suisse First Boston executives were among the "special investors" allowed to invest in LJM2's pre-funding and unusually high guaranteed rates of returns. CSFB executives personally invested about $22.5 million dollars in LJM2.

195.    Significantly, CSFB's boilerplate disclosures remained the same both before and after CSFB began its participation and funding of LJM2 in December 1999.  CSFB never specifically disclosed the investments of its top executives in the entity, CSFB's funding of the SPE during 2001, or the significant conflicts of interest inherent in LJM2.

196.    CSFB's participation in Enron's fraud, of course, was not limited to LJM Cayman and LJM2.

197.    CSFB, along with other banks, made a sham loan of $125 million to Hawaii 125-0 in connection with The New Power IPO, where the banks secretly received a total return swap guarantee from Enron against any loss.  Enron sold millions of New Power warrants to Hawaii 125-0 to "secure" the banks' loans and to create a $370 million profit for itself on the purported gain on these warrants.  Hawaii 125-0 then purportedly "hedged" the warrants with the Enron-controlled "Porcupine" SPE, which LJM2 had previously capitalized with $30 million for the hedge of the New Power warrants.  One week later, Porcupine emptied its coffers when it paid back the money plus $9.5 million to LJM2, another source of significant and suspiciously fast returns for LJM's investors, which included top CSFB officials.

35

198.    CSFB made another disguised loan in the form of a sham "swap" of $150 million, repayable over two years, to Enron in 2000 with payments varying with the cost of oil.  CSFB spokesman Pendleton was quoted as conceding, "It was like a floating-rate loan. We booked it as a loan."  CSFB, of course, knew that Enron did not book it as a loan.

199.    In a letter from Steven Wooten, an attorney in CSFB's London legal department to James Moran, a banker in CSFB's credit products division, Wooten wrote, "I hope you fully shift any blame from this line of business."

200.    The DLJ group headed by Laurence Nath created some of the most esoteric and complicated Enron-related sham transactions and SPEs.  In a process dubbed "structured products," the DLJ group created an entire series of devices for deceiving investors.  These SPEs were given names such as Osprey, Marlin, Firefly, Mariner and Raptor.  By means of these entities and the transactions associated with them, CSFB aided Enron in a massive scheme of selling unwanted assets at inflated prices in non-arm's-length transactions to create artificial profits for Enron.

201.    Laurence Nath worked closely with Enron to create these unusual SPEs and transactions.  When an asset was sold to one of the SPEs as a quick-fix solution to remove an asset from Enron's balance sheet, it was referred to as "monetizing" the asset.  Nath routinely went to Houston for periods of a week or two, met with a group from Enron's treasury and global finance departments (sometimes referred to as "Fastow's field marshals"), including Jeff McMahon or Ben Glisan, successive treasurers of Enron.  Nath would then create solutions to new "problems" such to allow Enron to doctor its books and continue its façade as a profitable company.

202.    Many of Nath's devices shared the same unusual feature:  the SPEs' debt and equity were indirectly backstopped by holdings of Enron stock to reassure lenders and secure investment-grade ratings.  There were set "trigger points," at which the stock's declining value would require Enron to provide more shares as collateral or even result in forced liquidation of the common stock if Enron's credit rating was downgraded.  These "trigger points" occurred at stock prices between $19-83 per share, depending upon the particular SPE.  When the "trigger point" was reached, the SPEs' debt issues became recourse to Enron.

203.    By the end of 2000, after CSFB acquired DLJ, CSFB had gained additional detailed knowledge concerning the SPEs created as dumping grounds for unwanted assets. Credit Suisse already had material information regarding fraudulent "prepay" transactions, LJM2 and various other manipulative devices used to fraudulently enhance Enron's reported earnings and profits.

204.    CSFB thus at all relevant times had actual knowledge of Enron's true financial condition.  An Enron insider remarked, "There's no question that senior people at Credit Suisse First Boston knew what was going on and that it was a house of cards."  One attendee of a meeting in July 2001, when Enron's stock had fallen into the $40s, revealed that the "triggers" were discussed by senior Enron executives and Credit Suisse bankers.  One of the bankers reportedly remarked, "If this thing [Enron's stock price] hits the $20s, you better run for the hills."  Another attendee said about the bankers, "There was no question that they knew exactly what lay inside the structures, when the triggers went off—everything.  You could almost say they knew more about the company than people in Enron did."

205.     In reference to Enron's repeated public statements that its stock was undervalued, CSFB's directors asked an Enron manager: "How can you guys keep doing this?"  Even at $40 per share, Enron's stock was overvalued in the bank's view, as reflected in comments to Enron's management that the stock price was at a critical juncture.  Credit Suisse directors noted that, if Enron's stock price continued to fall, the drop would cause the Raptor SPE to unwind and the debt balance would come due.  When an Enron executive stated that he thought Enron's off-balance sheet debt was between one and two billion dollars, the CSFB representatives responded, "Try eight to 12 billion" and that if Enron's stock dips to $20 per share, things would come falling down.

206.     In an October 19, 2001, Jonathan Yellen, a CSFB banker on Enron's "coverage team" wrote in an email to another CSFB banker, "Every time I read about Enron's latest travails I think of your ominous warnings two years ago that the house of cards may some day collapse. . . .  Hopefully we're still making good money on that account anyway.  It seems like we are."

207.     CSFB/DLJ was involved in both devising (along with Deutsche Banc) and promoting the Osprey offerings in late 1999 and early 2000.  The Osprey/Whitewing SPEs were designed as a dumping ground for Enron's unwanted or unmarketable assets.

208.     The 1999 Osprey I offering involving the sale of $1.4 billion in 8.31% Senior Secured Notes due January 15, 2003 and $100 million of beneficial ownership Osprey Trust Certificates.

209.     The 2000 Osprey II offering involved sale of  $750 million in 7.797% Senior Secured Notes as well as euro denominated notes also due January 15, 2003, plus $50 million of beneficial ownership Osprey Trust Certificates.

210.    Both Osprey I and Osprey II were privately placed and the offering documents included minimal information concerning the assets to be purchased.  The investors thus were forced to rely on the due diligence performed by Citigroup and the other underwriters.

211.    The little information provided in the offering materials was false and misleading.  The offering memorandum falsely stated that Enron assets would be purchased by means of "arms length negotiations;" failed to disclose that Osprey Trust funds would be used to be purchased assets from Citigroup, one of the Osprey underwriters; and misrepresented the power of the trust investors to liquidate the trust's assets.

212.    CSFB knew that the Osprey/Whitewing structure would hide Enron's manipulation of assets and result in incorrect financial reporting by Enron.

213.    CSFB and Deutsche also conspired with Citigroup in this fraudulent transaction by failing to disclose Citigroup's planned transfer of Nighthawk to Osprey/Whitewing. Although the Osprey I offering documents explained that Osprey funds would be used to acquire assets from an "undisclosed third party," CSFB, Deutsche and Citigroup knew long before the Osprey I closing that Citigroup -- an underwriter, promoter and placement agent for the Osprey securities -- was this "third party."

214.    The reason that Citigroup was not specified in the offering materials as the "third Party" has never been explained.  The most reasonable inference: CSFB, Deutsche and Citigroup did not want to reveal that the Banks were shifting the risk of an Enron default from the Banks to other investors.

215.    CSFB was rewarded by Enron for devising these sham SPEs and other transactions, and for its "boosterism" of Enron securities, with profitable Enron and Enron-related debt and equity underwriting business.

216.    CSFB and DLJ (shortly before the merger of CSFB and DLJ) were lead underwriters (with DLJDIRECT, Inc.) in connection with the October 5, 2000 initial public offering (IPO) of 24 million shares of TNPC, Inc., an Enron-affiliated entity, whose subsidiary was The New Power Company.

217.    CSFB acted as co-lead underwriter with Deutsche Banc Alex. Brown, Inc. in connection with a June 9, 1999 initial public offering of shares of Azurix, a downstream entity related to Enron.

218.    CSFB participated in arranging financing in November 2000 to allow Brigham Exploration Company to repurchase from Enron all of the debt and equity securities in Brigham held by Enron affiliates.

219.    CSFB was the lead underwriter, with other underwriters participating, in a $744 million public offering on or about February 12, 1999 of 12 million shares of Enron Corp. common stock at $62 per share.

220.    CSFB was the sole underwriter in a public offering on or about November 24, 1998 or $250 million of Enron 6.95% Notes due 2028.

221.    CSFB acted as representative for a syndicate of underwriters in a $750 million public offering on or about May 5, 1998 of 15 million shares of Enron common stock at $50 per share.

222.    CSFB was the co-lead underwriter in a public offering on or about November 26, 1997 of $100 million of Enron Oil & Gas 6.50% Notes.

223.    CSFB's conduct demonstrates its intent to aid and abet fraud, particularly when CSFB's continuous "buy" recommendations for Enron securities issued between July 1999 and October 2001 are also considered.