224. CSFB issued false and misleading positive analyst reports on July 6, 1999, July 13, 1999, September 2, 1999, October 12, 1999, November 30, 1999, January 18, 2000, January 21, 2000, February 28, 2000, April 13, 2000, October 18, 2000, April 17, 2001, August 14, 2001, August 17, 2001, October 19, 2001 and October 23, 2001.

225. Curt Launer, the CSFB analyst covering Enron, waited until November 29, 2001 – just three days prior to the filing of Enron's bankruptcy petition -- to downgrade Enron securities from a "buy" to a "hold."

226. According to media reports, at least one former Enron employee stated that Enron employees were encouraged to steer underwriting assignments and mergers and acquisitions work to CSFB and certain other investment banks that consistently recommended the purchase of Enron securities.

227. Purchaser and thus Plaintiffs were harmed by CSFB's wrongful conduct.

**Merrill Lynch ("Merrill")**

228. Merrill Lynch entered into approximately 35 transactions with Enron, including underwritings, structured finance, derivative and lending transactions.

229. From 1999-2001, Merrill received $38 million in fees from Enron just for Merrill's underwriting services and for advice.

230. Merrill received particularly handsome compensation as the placement agent for $394 million LJM2 fund. In the end, Merrill raised approximately $265 million of this $394 million.

231. In October 1999, Merrill Lynch & Company prepared and promulgated a "Private Placement Memorandum" entitled "LJM2 Co-Investment, L.P." as part of its course of conduct aimed at defrauding investors and aiding Enron to defraud investors. This

41

document materially misrepresented the nature of, and the inherent conflict of interest that inherently arose, because of LJM2's structure.

232.    Indeed, the LJM2 offering material actually touted the conflict of interest inherent in the structure -- Andrew Fastow acting as LJM2's general partner at the same time Fastow was an Enron executive obliged to serve Enron's interests – as an advantage.

233.    The LJM2 private placement memorandum emphasized the "unusually attractive investment opportunity" that would result from the "benefit of having the opportunity to invest in Enron-generated investment opportunities that would not be available otherwise to outside investors." The memorandum also promised that Fastow's "access to Enron's information pertaining to potential investments will contribute to superior returns."

234.    Merrill executives were among the "select investors" allowed to invest in LJM2 with guaranteed high returns. Ninety-seven Merrill executives invested approximately $16 million dollars in the sweetheart deals.

235.    Merrill's "relations" representative, Schuyler Tilney, realized the conflict-of-interest problem and raised his concerns with Enron executives Andrew Fastow and Jeffrey Skilling. Merrill nonetheless decided to proceed with placement of LJM2 at Fastow's behest because of the lucrative fees.

236.    Merrill also aided Enron's fraud in what has become known as the "Nigerian Barge Transaction."

237.    In the Nigerian Barge Transaction, which closed December 29, 1999, Merrill Lynch purported to purchase a portion of Enron's interest in future cash flows to be generated from three power-producing barges anchored off the coast of Nigeria. Although Enron

structured the transaction to look like a sale, in reality the transaction was a short-term loan from Merrill to Enron.

238. The risks of ownership of the barges never passed to Merrill Lynch. Fastow committed, in an undisclosed side deal, to take Merrill Lynch out of the transaction within six months at an agreed rate of return if Merrill could not profitably sell the assets within the six month period. In accordance with the side agreement, Enron arranged for LJM2 to take Merrill Lynch out of the transaction six months later.

239. Enron reported, as Merrill Lynch knew it would, $12 million in earnings from this transaction at the end of 1999. Thus the loan proceeds were improperly booked by Enron as revenue.

240. One of Merrill's executives, James Brown, warned Merrill that the barge deal would deceive investors and cautioned that participation in the barge transaction posed a reputational risk. Brown's concern with the propriety of Enron's accounting for the transaction stemmed from the side agreement that Enron had made to take Merrill Lynch out of the transaction within six months at an agreed rate of return. Such an agreement, if disclosed to Enron's auditors, would have precluded Enron from accounting for the transaction as a sale.

241. Merrill chose to ignore Brown's warning.

242. A Merrill internal publication called "Americas Credit Flash Report" for the week ending December 23, 1999, unabashedly explained the deceptive nature of the transaction: "This transaction will allow Enron to move assets off-balance sheet and book future cash flows currents as 1999 earnings (approximately $12mm) . . . IBK was supportive

43

based on Enron relationship (approx. $40mm in annual revenues) and assurances from Enron management that we will be taking out of our $7mm investment within next 3-6 months."

243. Merrill's total profit from the barge transaction, including the up-front fee and the exorbitant 15% return on equity, was $775,000 (a total return of 22.5%).

244. In a recent criminal prosecution, two individuals were convicted for their participation in aiding Merrill and Enron to perpetrate the Nigerian Barge Transaction fraud.

245. In an even more massive scam, Merrill engaged in fraud to conceal Enron's debt from investors by entering into a series of complex gas and power trades in late 1999 to boost Enron's year-end reported profits. A former Enron executive was quoted in the news media as saying, "This was absolutely a sham transaction and it was an 11th hour deal."

246. Enron used these 1999 transactions solely to achieve financial statement results. As noted by Neal Batson, "Despite concerns over Enron's intended accounting for these transactions, Merrill Lynch entered into these transactions knowing that Enron intended to book $50-60 million in earnings from these virtually off-setting transactions and that those earnings would assist Enron in achieving earnings targets for 1999."

247. An internal Merrill email dated May 30, 2000 from Schuyler Tilney to Dan Gordon states, "We were clearly helping them make earnings for the quarter and year (which had a great value in their stock price, not to mention personal compensation)."

248. Thus, Merrill Lynch knew that the Enron SPEs, such as LJM2, and other sham transactions such as the Nigerian power barge deal and the 1999 power trades, were improper and that they were used to doctor Enron's reported financial results. This being known at the highest levels of Merrill Lynch management, Merrill nonetheless continued aiding Enron's fraud.

249. Merrill Lynch, from the start and until Enron's demise, was an outspoken booster for Enron Corporation and Enron-affiliate entities. Merrill analysts, moreover, were required to tow the party line.

250. Enron complained to Merrill Lynch management that one of Merrill's analysts, John Olson, had downgraded his rating of Enron stock. When Olson stood by his assessment after Merrill's management pressured him to upgrade the rating, Olson's employment at Merrill was terminated.

251. Specifically, on July 15, 1997, Olson downgraded Enron's equity rating from "buy" to "hold." Enron informed Merrill of its dissatisfaction with the downgrade. On April 18, 1998, a memo from Merrill's Investment Banking Division to Merrill's president complained that Merrill was not selected as a lead or co-manager of a $750 million common stock offering because of Enron's dissatisfaction with Merrill's research recommendation concerning Enron securities.

252. In mid-1998 Olson was told that his services would no longer be needed at Merrill.

253. On November 16, 1998, Merrill's newly assigned analyst, Donato Eassey, upgraded Enron's equity rating.

254. An email from Merrill's Investment Banking Division dated January 18, 1999 updated Merrill's president on Merrill's "relationship with Enron since you spoke to their CEO, Ken Lay, last spring regarding our difficult relationship with Research. It is clear that your responsive message was appreciated by the Company, and any animosity in that regard seems to have dissipated in the ensuing months . . . To that end, we have recently been

45

awarded two significant mandates by Enron . . . Total fees to Merrill Lynch for these two transactions alone should be $40-50 million."

255. Merrill issued positive analyst's reports, which misstated Enron true financial condition, on numerous occasions including but not limited to January 1, March 31, April 13, July 14, and October 12, 1999; January 18, January 24, April 13 and October 17, 2000; and on October 9, 2001.

256. Thus, to the end, Merrill conspired with Enron and substantially assisted Enron's perpetration of fraud.

257. Damages were suffered damages as a result of this deceptive and wrongful conduct.

**Deutsche Banc ("Deutsche" or "Deutsche Banc")**

258. Deutsche Banc provided Enron with commercial banking and investment banking services for many years. Because of its long-term relationship with Enron and its status as a major lender to Enron, top Deutsche Banc officials regularly met with Enron executives, providing Deutsche the true facts of Enron's financial condition.

259. Along with Citigroup, Deutsche Banc functioned as a lead bank for Enron's main credit facilities, lending to Enron and helping to raise some $5 billion from the investing public for Enron Corporation and Enron-affiliated entities.

260. Deutsche was considered an Enron "tier 1" bank and engaged in a variety of transactions including traditional lending, participation in debt and equity offerings, devising structured finance transactions and tax advice. From 1997-2001, Deutsche was paid approximately $72 million by Enron for its various services.

261. Deutsche Banc played a major role in a series tax-related transactions between 1995 and 2000 referred to as the "BT/Deutsche Tax Transactions." Deutsche designed these transactions, promoted them to Enron and participated in the transactions – often as the only participant other than Enron-related entities. The transactions were named Teresa, Steele, Tomas and Cochise.

262. The BT/Deutsche Tax Transactions were designed to manipulate Enron's financial statements and Deutsche knew these transactions resulted in dissemination of financial information about Enron that was materially false.

263. Neal Batson concluded that these transactions were, for the most part, artificial transactions lacking any bona fide business purpose other than the creation of accounting income for Enron and were designed to allow Enron to manipulate its reported financial results.

264. The Tax Opinion for Teresa, from King & Spalding to Enron dated July 29, 1997, confirms Baton's conclusions and shows that the improper purpose of the transactions was known from the start. The opinion letter states that Enron and its affiliates would not gain a net tax benefit from the transaction and that, "The predominant purpose of Enron and its Affiliates for participating in the Purchase was to generate income for financial accounting purposes."

265. The Steele and Cochise Transactions, moreover, were designed to allow Enron to record the potential benefit of speculative future tax deductions as pre-tax income on its financial statements rather than as after-tax income resulting from reduced tax expenses in the tax provision of Enron's income statement. The characterization of those items as pre-tax

income was misleading because readers of Enron's financial statements were unaware that those amounts arose from a tax-related transaction.

266. Additionally, by acting as a conduit for a sale in the Cochise Transaction, Deutsche enabled Enron to falsely report $36.5 million of gain on the sale, an amount equal to more than 10% of Enron's reported net income for the quarter.

267. Deutsche received approximately $43 million in fees, associated with the BT/Deutsche Tax Transaction alone, during 1997 through 2001.

268. Deutsche's structured finance assistance for Enron came primarily from a group headed by Michael Jakubik. After employment with Bankers Trust Corporation, a company specializing in derivatives and other exotic financing methods, Jakubik went to work for Enron as a financial executive. In September 2000, he joined Deutsche.

269. Deutsche obtained critical and detailed information about LJM2, about the false hedging structures, and about Enron's sorry financial condition through Jakubik. As Enron Executive Vice President and Enron North America's CFO, Jakubik became intimately familiar with the structure and true purpose of LJM2. Indeed, Jakubik promoted the idea of investment vehicles such as LJM2 while employed at Enron.

270. Deutsche Banc, as noted, was a participant in LJM2.

271. Deutsche Banc executives (through BT Investment Partners) also aided in prefunding LJM2. Deutsche executives personally invested some $10 million and thereafter enjoyed extraordinary distributions for their personal investments.

272. As also already noted, Deutsche and CSFB (at the time DLJ) devised and promoted the 1999 Osprey I offering involving the sale of $1.4 billion in 8.31% Senior Secured Notes due January 15, 2003 and $100 million of beneficial ownership Osprey Trust

Certificates, and the 2000 Osprey II offering of $750 million in 7.797% Senior Secured Notes as well as euro denominated notes, plus $50 million of beneficial ownership Osprey Trust Certificates.

273.   Osprey I and Osprey II were privately placed and the offering documents included minimal information concerning the assets to be purchased. Investors were required to rely on the due diligence performed by Deutsche and the other underwriters.

274.   The little information provided in the offering materials was false and misleading. The offering memorandum falsely stated that Enron assets would be purchased by means of "arms length negotiations;" failed to disclose that trust assets were to be purchased from Citigroup, one of the underwriters; and misrepresented the power of the trust investors to liquidate the trust's assets.

275.   Deutsche, moreover, conspired with CSFB and Citigroup to hide Enron's manipulation of assets and result in incorrect financial reporting by Enron. They also conspired to conceal Citigroup's stealth transfer of its Nighthawk assets to Osprey.

276.   In Osprey, accordingly, Deutsche, CFSB and Citigroup conspired to aid Enron in falsifying its consolidated financial results and conspired hide from the investing public the transfer of Citigroup's Enron-related risk to private investors.

277.   Enron also participated, and received fees for participating, in a number of other structured transactions with colorful names such as Hawaii 125-0, Rawhide, Cornhusker, Macarthur, Leftovers, Riverside 3 and Ponderosa Pines (also referred to as the "Brazos Synthetic Lease") that were designed to aid Enron's fraud.

278.   In return for aiding Enron cook its books, Deutsche Banc was allowed to participate in other Enron and Enron-related equity and debt offerings.

49

279. Deutsche Banc Securities Inc. acted as one of the underwriters for a March 1, 2000 offering of $1,400,000,000 of 8.31% Senior Secured Notes due 2003 and Enron Corp. Mandatory Convertible Junior Preferred Stock, Series B, in connection with Enron's investments in the Marlin and Atlantic Water Trusts.

280. Deutsche Banc Securities Inc. was one of the underwriters for a March 1, 2000 offering of $1,400,000,000 of 8.31% Senior Secured Notes due 2003 and Enron Corp. Mandatory Convertible Junior Preferred Stock, Series B, in connection with Enron's investments in the Marlin and Atlantic Water Trusts.

281. Deutsche Banc Alex. Brown, Inc. acted as co-lead underwriter with CSFB for the June 9, 1999 initial public offering of shares of Azurix, a downstream entity related to Enron's investments in the Marlin and Atlantic Water Trusts.

282. Deutsche Banc Alex. Brown, Inc. acted as an underwriter in connection with the sale of $1,907,698,000 Enron Corp. Zero Coupon Convertible Senior Notes due 2021, in a 144A private placement on February 7, 2001.

283. Deutsche plainly had knowledge of Enron's true financial condition. This knowledge was gained from Deutsche's tax division, from Jakubik and his structured finance division, and from meetings between Deutsche's Houston-based relations representative.

284. Deutsche relationship manager Paul F. Cambridge testified before the Enron bankruptcy examiner that he monitored Enron's financial condition. Cambridge testified that he had access to members of Enron's senior management including Fastow, Glisan and McMahon. Cambridge also stated that he would, from time to time, arrange meetings with Enron to discuss elements of their balance sheet, earning and performance.

285. Notwithstanding its knowledge of Enron's finances and involvement in manipulative transactions, Deutsche issued misleading, positive statements about Enron's financial condition, including reports dated January 13, 1999, January 20, 1999, April 13, 1999, May 25, 1999, January 28, 2000, April 14, 2000, May 26, 2000, July 25, 2000 and September 15, 2000. The effect of these reports was to further inflate the price of Enron securities.

286. Deutsche's wrongful conduct resulted in harm to Purchaser and Plaintiffs.

**Each Defendant Is Liable**

287. Enron's fraudulent manipulation of financial statements filed with the SEC and disseminated to the public is well documented. Enron could not have engaged in its fraudulent scheme without Defendants' assistance, and each Defendant aided Enron in the commission of fraud.

288. Each Defendant, through its continuous relationship with Enron officers, through due diligence investigations performed in conjunction with underwriting Enron securities, and as a result of its direct participation in "off balance sheet" transactions, had knowledge of Enron's fraud.

289. Each Defendant purposely devised transactions for the purpose of concealing Enron's true financial condition in such a way that Enron could doctor its financial reports. Each Defendant thus provided substantial assistance by devising and implementing the various deceitful transactions that aided and abetted Enron's fraud.

290. Each Defendant, moreover, could plainly foresee that investors such as Purchaser would rely upon material misrepresentations and material omissions of fact promulgated in

Enron's financial statements. Defendants could also foresee that their own recommendations to purchase Enron securities further aided Enron's fraudulent agenda.

291.   As registered securities brokers, each of the Defendants had a professional duty to refrain from knowingly disseminating false information, but they disregarded this duty.

292.   Each Defendant also had an obligation not to commit fraud or aid Enron perpetrate fraud.

293.   Each Defendant nonetheless aided and abetted Enron's fraud in violation of both statutory and common law. Enron perpetrated fraud by issuing false financial results; each Defendant had knowledge of this fraud; and each Defendant gave substantial assistance in achievement of the fraud.

294.   Each Defendant engaged in a civil conspiracy, in violation of the common law, by its agreeing with Enron and/or with other Defendants to devise deceptive and fraudulent transactions, and by executing and promoting these transactions in furtherance of the conspiracy.

295.   Plaintiffs, standing in Purchaser's shoes, suffered damages as a result of each Defendant's wrongful conduct.

296.   Each Defendant, moreover, exhibited such an entire want of care as to indicate that the acts and omissions in question were the result of conscious indifference to the rights and welfare of Purchaser so as to constitute gross negligence. Plaintiffs, standing in the shoes of Purchaser, are therefore entitled to an award of exemplary or punitive damages.

## CAUSES OF ACTION[2]

297. The factual allegations in the above-numbered paragraphs are hereby incorporated by reference into each cause of action asserted.

### Count I: Violations of the Texas Securities Act

298. Each Defendant violated article 581-1, *et seq.*, in particular article 581-33(F), of the Texas Security Act.

299. Each Defendant violated, conspired to violate and/or aided and abetted Enron commit fraud in violation of Article 581-33(F) by aiding Enron manipulate and materially misrepresent its reported financial results.

300. Enron offered and sold securities in violation of the Texas Securities Act, article 581-33(A). Enron violated article 581-33(A) by making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

301. Each Defendant directly and/or indirectly, with intent to deceive or defraud or with reckless disregard for the truth and/or the law, materially aided Enron, the seller and issuer of the securities at issue, to commit a violation of article 581-33(A) of the Texas Securities Act. As such, each Defendant violated article 581-33(F).

302. Purchaser, and thus Plaintiffs, suffered damages as a result of each Defendant's violation of the Texas Securities Act, article 581-33(F).

---

[2] The common law causes are brought under Texas law or, in the alternative, under New York law.

**Count II: Fraud**

303. Each Defendant is liable to Purchaser under the common law for committing fraud, including in particular, aiding and abetting fraud and conspiracy to defraud.

304. Each Defendant engaged in common law fraud by (a) employing devices, schemes, conspiracies and artifices to defraud; (b) making untrue statements of material facts or omitting to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaging in acts practices and a course of business which operated as a fraud or deceit upon Purchaser in connection with the purchase of Enron securities.

305. Each Defendant knew and/or recklessly disregarded the fact that the aforesaid acts and practices, misleading statements and omissions would adversely affect the integrity of the market and the investment rating given by rating agencies to Enron debt securities. Had the adverse facts Defendants concealed been disclosed, the sale of the Notes to Purchaser would not have been possible.

306. Each Defendant aided and abetted Enron's fraud because (a) Enron engaged in a scheme to defraud Purchaser and other investors; (b) each Defendant had knowledge of this fraud; and (c) each Defendant gave substantial assistance to Enron in the achievement of the fraud.

307. Purchaser, and thus Plaintiffs, were harmed by this wrongful conduct.

### Count III: Civil Conspiracy

308.  As discussed, each Defendant is liable for aiding and abetting fraud, the tort underlying the conspiracy claim.

309.  Each Defendant, in pursuance of a common plan or design to commit a tortious act, took part in it, or furthered it by cooperation or request, or lent aid or encouragement to Enron's fraud, or ratified or adopted Enron's wrongful acts done for its benefit, is equally liable.

310.  Each Defendant is liable for harm caused by Enron's fraud because (a) each Defendant did a tortious act in concert with Enron and with other Banks pursuant to a common design with Enron; (b) each Defendant knew that Enron's conduct was wrongful and that the conduct of other Defendants in aiding Enron was wrongful; (c) each Defendant gave substantial assistance in accomplishing the tortious result.

311.  Each Defendant engaged in civil conspiracy because (1) each Defendant and at least one other party; (2) set out to allow Enron to disseminate false financial information; (3) there was a meeting of the mind between Enron and each Defendant, and at time between Enron and several Defendants simultaneously; (4) there was at least one overt act in furtherance of the conspiracy and (5) damages proximately resulted.

312.  Purchaser, and thus Plaintiffs, were harmed by each Defendant's conduct.

### PRAYER

276.  Plaintiffs pray that each Defendant be cited to appear and answer herein, and that upon trial of this cause, judgment be rendered for Purchaser as follows:

    a.    All direct, consequential, and special damages;

    b.    All equitable relief to which they may be entitled;

    c.    Prejudgment interest;

    d.    Punitive damages as provided by statutory and common law;

    e.    Attorneys' fees and legal expenses (including expert fees);

    f.    Post judgment interest; and

    g.    Costs of court.

Plaintiffs further pray for general relief and such other and further monetary or equitable relief to which they may be entitled.

Plaintiffs respectfully demand a trial by jury.

Respectfully submitted,

GREER, HERZ & ADAMS, L.L.P.

By: _____
Andrew J. Mytelka
Attorney-in-charge
State Bar No. 14767700
John S. McEldowney
State Bar No. 13580000
Joe A.C. Fulcher
State Bar No. 07509320
M. David Le Blanc
State Bar No. 00791090
Steve Windsor
State Bar No. 21760650
One Moody Plaza, 18th Floor
Galveston, Texas  77550
(409) 797-3200
(409) 766-6424 (FAX)

ATTORNEYS FOR PLAINITFFS

# CIVIL COVER SHEET

JS 44 (Rev 3/99)

The JS-44 civil cover sheet and the information contained herein neither replace no supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
RAVENSWOOD I, L.L.C., RAVENSWOOD II, L.L.C., WHITEWOOD L.L.C.

(b) County of Residence of First Listed Plaintiff **Boston, MA**
(EXCEPT IN U.S. PLAINTIFF CASES)

### DEFENDANTS
Citigroup Inc; Citicorp; Citibank NA; Citicorp North America Inc; Salomon Smith Barney, Inc; JP Morgan Chase & Company; Credit Suisse First Boston, LLC; Credit Suisse First Boston (USA) Inc; Donaldson Lufkin & Jenrette Securities Corporation; Pershing LLC; Merrill Lynch & Company; Merrill, Lynch Pierce, Fenner&Smith, Inc; Deutsche Banc Alex. Brown; Deutsche Banc Alex. Brown Inc., Deutsche Bank Securities, Inc.

County of Residence of First Listed Defendant:
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED

United States Courts
Southern District of Texas
FILED

(c) Attorney's (Firm Name, Address, and Telephone Number)
Andrew J. Mytelka, Greer, Herz & Adams, L.L.P.
One Moody Plaza, 18th Floor
Galveston, Texas 77550
(409) 797-3200

Attorneys (If Known)

H-04-4520

NOV 3 0 2004

Michael N. Milby, Clerk of Court

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINICPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place and "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reappointment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 365 Personal Injury – Product Liability | ☐ 630 Liquor Laws | PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R R & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loan (Excl Veterans) | ☐ 345 Marine Product Liability | PERSONAL PROPERTY | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 690 Other | | ☒ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | LABOR | SOCIAL SECURITY | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damages Product Liability | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environment Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| REAL PROPERTY | CIVIL RIGHTS | PRISONER PETITIONS | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence Habeas Corpus, | | FEDERAL TAX SUITS | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | ☐ 740 Railway Labor Act | | ☐ 950 Constitutionality of State Statutes |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 535 Death Penalty | | ☐ 870 Taxes (U S Plaintiff or Defendant) | ☐ 890 Other Statutory Actions |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | ☐ 790 Other Labor Litigation | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | ☐ 871 IRS – Third Party 26 USC 7609 | |
| ☐ 290 All Other Real Property | | ☐ 555 Prison Condition | ☐ 791 Empl Ret Inc Security Act | | |

### V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

### VI. CAUSE OF ACTION (Cite the U S Civil Statute under which you are filing and write brief statement of cause Do not cite jurisdiction statutes unless diversity)
Texas Securities Act, Tex. Rev. Civ. Stat. Ann. Art. 581 – 1 et seq.; Texas Business & Commerce Code section 27.01 and various common law claims.

### VII. REQUESTED IN COMPLAINT: ☐ CHECK IF THIS IS A CLASS ACTION UNDER F R C P 23   DEMAND approx. $115 million actual damages + CHECK YES only if demanded in compliant

JURY DEMAND ☒ Yes   ☐ No

### VIII. RELATED CASE(S) IF ANY (See instructions)
Mark Newby v. Enron Corp., et al; Consolidated Lead No. H-01-3624
JUDGE  Judge Melinda Harmon   DOCKET NUMBER  H-01-3624

DATE 29 Nov 04   SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____