IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re ENRON CORPORATION SECURITIES, DERIVATIVE & "ERISA" LITIGATION, | §<br>§<br>§ | MDL 1446 |

| | | |
|---|---|---|
| MARK NEWBY, et al., | §<br>§ | |
| Plaintiffs | §<br>§ | |
| VS. | §<br>§ | CIVIL ACTION NO. H-01-3624<br>  AND CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | §<br>§ | |
| Defendants | § | |

| | | |
|---|---|---|
| RAVENSWOOD I, L.L.C., RAVENSWOOD II, L.L.C., and WHITEWOOD, L.L.C., | §<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| VS. | §<br>§ | CIVIL ACTION NO. H-04-4520<br>  (COORDINATED CASE) |
| CITIGROUP, INC., et al., | §<br>§ | |
| Defendants. | § | |

## OPINION AND ORDER OF DISMISSAL

Pending before the Court in H-04-4520, alleging under state law, either Texas or New York,[1] that Defendants[2] conspired with and

---

[1] The First Amended Complaint alleges claims under Texas law for aiding and abetting under the Texas Securities Act, Tex. Rev. Civ. Stat. Ann. article 581-33(F)(2)("A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issue, and to the same extent as if he were the seller, buyer, or issuer"), and common law fraud and conspiracy to defraud.  #20, ¶¶ 1187-212. Alternatively, under New York common law the complaint asserts claims for conspiracy/concerted action and aiding and abetting fraud.  *Id.* at ¶¶ 1256-77, 1278-96.

[2] Remaining Defendants are JP Morgan Chase & Company ("JPMC"), Merrill Lynch & Company, Merrill Lynch, Fenner & Smith (collectively, "Merrill Lynch"), Credit Suisse First Boston, Inc., Credit Suisse First Boston, LLC, Credit Suisse First Boston(USA),

aided and abetted Enron in a giant Ponzi scheme to misrepresent Enron's financial situation in order to lure investors like Plaintiffs,[3] who sued individually[4] and as successors-in-interest to claims of initial purchaser Enron debt securities in May 2001, The Prudential Insurance Company of America ("Prudential"), are the following motions:  (1) Defendants' joint motion to dismiss (#22) Plaintiffs' First Amended Complaint,[5] filed on September 18, 2006; and (2) Plaintiffs' motion for leave to file amended pleading (#55), with proposed complaint filed on February 28, 2011.

Because the latter motion determines which complaint will govern, essential to resolving the motion to dismiss, the Court addresses #55 first.

**I.   Plaintiffs' Motion For Leave to File Amended Pleading (#55)**

---

Inc., Pershing LLC (collectively "CSFB"), and Deutsche Bank Securities, Inc.   The Citigroup entities (Citigroup, Inc., Citicorp, N.A., Citibank, N.A., Citicorp North America, Inc. and Salomon Smith Barney) were dismissed on January 1, 2007 (#41) and withdrew from the joint motion to dismiss (#39).

[3] Plaintiffs Ravenswood Capital I, LLC, Ravenswood Capital II, LLC (collectively "Ravenswood"), and Whitewood Holdings, LLC ("Whitewood") claim they are successors-in-interest to claims of The Prudential Insurance Company of America ("Prudential"), which on May 30, 2001 purchased $115,524,964 of two Enron Senior Notes in a sale that closed in Houston, Texas. Copies of the two Notes are attached to #23, Exs. 1 and 2.

[4] Plaintiffs now concede that their claims brought in their "individual" capacity do not exist.  They concede that they inadvertently used "plaintiffs" where they should have used "Prudential" and request leave to amend.

[5] The First Amended Complaint, filed on August 17, 2006, is #20.

## A.  Standards of Review

Federal Rule of Civil Procedure 16(b) governs amendment of pleadings once a scheduling order's deadline to amend has expired. *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008); *Marathon Financial Ins., Inc. v. Ford Motor Co.*, 591 F.3d 458, 470 (5th Cir. 2009).  According to Rule 16(b), which has a stricter standard than Rule 15(a), once a scheduling order has been entered, "it may be modified only for good cause and with the judge's consent."  The good cause standard requires the party seeking leave to amend after the deadline to amend has expired to "'show that the deadlines cannot reasonably be met, despite the diligence of the party needing the extension.'"  *Marathon*, 591 F.3d at 470, *quoting S&W Enters., LLC v. Southtrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003)(*quoting* 6A Charles Alan Wright, et al., *Federal Practice and Procedure* § 1522.1 (2d ed. 1990)).  In determining whether good cause exists, the court should consider four factors:  "'(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of continuance to cure such prejudice.'" *Id., quoting Southwestern Bell Tel. Co. v. City of  El Paso*, 346 F.3d 541, 546 (5th Cir. 2003)(*citing S&W Enterprises*, 315 F.3d 533, 536 (5th Cir. 2003)).  Only if the movant demonstrates good cause for the modification will the more liberal standard of Rule 15(a) then apply to the district court's decision whether to grant or deny leave to amend.  *S&W Enterprises*, 315 F.3d at 536.  A denial

of a motion to amend is reviewed for abuse of discretion. *Cambridge Toxicology Group, Inc. v. Exnicios*, 495 F.3d 169, 177 (5th Cir. 2007).

Federal Rule of Civil Procedure 15(a) provides in relevant part,

> A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served.  Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.

A court has discretion in deciding whether to grant leave to amend. *Foman v. Davis*, 371 U.S. 178, 181 (1962).  Since the language of the rule "'evinces a bias in favor of granting leave to amend," the court must find a "substantial reason" to deny such a request. *Ambulatory Infusion Therapy Specialists, Inc. v. Aetna Life Ins. Co.*, Civ. A. No. H-05-4389, 2006 WL 2521411, *3 (S.D. Tex. Aug. 29, 2006), *quoting Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004), and *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 425 (5th Cir. 2004). Factors for the court to consider in determining whether a substantial reason to deny a motion for leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993).   The court should deny leave to

amend if it determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face . . . ." 6 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Proc.* § 1487 (2d ed. 1990).

While Rule 15(a) does not establish a time limit for filing a motion for leave to amend, "'at some point, time delay on the part of a plaintiff can be procedurally fatal.'" *Smith v. EMC Corp.*, 393 F.3d at 595, *quoting Whitaker v. City of Houston*, 963 F.2d 831, 836 (5th Cir. 1992), *in turn quoting Gregory v. Mitchell*, 634 F.2d 199, 203 (5th Cir. 1981). If there is substantial delay, the plaintiff bears the burden of demonstrating that it was due to oversight, inadvertence or excusable neglect, *Id.*, *citing Gregory*, 634 F.2d 203.

**B. Plaintiffs' Request (#55)**

Plaintiffs seek leave to file a proposed Second Amended Complaint on the grounds that (1) there is "new" evidence (specifically the deposition of Andrew Fastow[6] taken in October-November 2006 and the non-prosecution agreement that Deutsche Bank entered into with the United States Department of Justice ("DOJ") on December 21, 2010), uncovered after Plaintiffs filed their First Amended Complaint, and (2) that Defendants' pending joint motion to dismiss was the first challenge to that pleading. They

---

[6] Plaintiffs state, "Fastow openly admits Enron's fraud in his testimony, as well as Defendants['] knowing participation and complicity in Enron's fraud." #55 at 8, citing Ex. 1 at ¶¶ 612-14, 599-601, 936, 1597-1622.

point out that in their response to the joint motion to dismiss, filed on November 2, 2006, they requested leave to amend.  #28 at 12.   Plaintiffs state that they "seek to clarify facts and theories previously set forth in their First Amended Complaint" in response to Defendants' joint motion to dismiss and thus the amendment should not cause surprise or prejudice.   Plaintiffs claim that they did not file a separate motion for leave to amend because of the scheduling order dated July 11, 2003 and because the Court had indicated that it would address *Newby* before the other consolidated cases.  #1561 and 4848 in H-01-3624.

## C.  Financial Institution Defendants' Opposition (#57)

As a preliminary statement the Financial Institutions assert that "Plaintiffs are a series of special purpose entities created by distressed debt investors that acquired, at deeply depressed prices, certain interests in the Notes at issue in this litigation after Enron's December 2, 2001 bankruptcy filing.   Based on distributions from the Enron estate and certain other recoveries, these Notes have returned to Plaintiffs almost triple their post-bankruptcy cost, and therefore there are no losses to recover."

Financial Institution Defendants insist that Plaintiffs fail to meet the "good cause" standard for amendment under Rule 16(b).

Defendants point to the Court's decision in *In re Enron Corp. Sec., Derivative & ERISA Litig.*, Civ. A. No. H-03-1558 (S.D. Tex. Dec. 13, 2007)(#584), in which the Plaintiffs also sought "to clarify facts and theories previously set forth in their First Amended Complaint," and the Court denied their motion for leave to

- 6 -

amend.  It found that Plaintiffs failed to demonstrate good cause for leave to amend as there was no evidence of diligence, just as there is none here.  Nor do Plaintiffs here explain how the "new" evidence would cure the standing and statute of limitations problems of the current complaint.

Defendants further object that the proposed Second Amended Complaint (a copy of which is attached to Plaintiffs' motion for leave to amend) adds  200 pages and almost 500 allegations. Plaintiffs' request for permission to amend comes more than five years after the close of fact and expert discovery, four years after Plaintiffs filed their First Amended Complaint, and four years after briefing was completed on the dispositive motions to dismiss the First Amended Complaint; Plaintiffs have not been diligent.  Although Plaintiffs' counsel was present for, and questioned Fastow during, his deposition, on November 2, 2009 Plaintiffs sought leave to amend in their response[7] to Defendants' motion to dismiss without even mentioning the just completed deposition.  Moreover Plaintiffs' instant motion for leave to amend was not filed until more than four years after Fastow's deposition was completed.  Plaintiffs fail to explain such an extraordinary delay.  Nor do they explain how this alleged new evidence cures the standing and statute of limitations defects in the First Amended Complaint, addressed in the motion to dismiss.

_____

[7] Defendants note that this purported request for leave to amend was not a motion but merely a request to allow Plaintiffs to "re-plead as needed to correct erroneous references to 'Plaintiffs'" in the First Amended Complaint.  #28 at 12.

Furthermore the conduct of Deutsche Bank at issue in the DOJ's non-prosecution agreement was unrelated to Enron, and it and the DOJ's investigation were public knowledge[8] long before Plaintiffs filed their First Amended Complaint; therefore Plaintiffs' challenge could have been raised long ago.  Defendants insist that neither Fastow's deposition nor Deutsche Bank's involvement in tax shelters constitutes "newly" uncovered evidence.

Although on January 28, 2009 Plaintiffs did file a motion for a status conference (#47), in which they claim they sought guidance from the Court on these issues, and a supplemental one (#50) on December 23, 2009, Defendants correctly point out that neither motion referenced the Fastow testimony or Deutsche Bank's agreement, nor suggested that Plaintiffs were considering amending their pleadings.

Furthermore, the Financial Institutions maintain, fundamental pleading defects in the First Amended Complaint are not cured by Fastow's testimony nor Deutsche Bank's agreement with the DOJ. First of all, when Plaintiffs sued on November 30, 2004, they were only "participants" as opposed to owners of the Notes and thus

---

[8] Defendants note that on March 23, 2006 Deutsche Bank disclosed publicly that the DOJ was conducting a criminal investigation of tax-oriented transactions that were executed from 1997-2001 involving Deutsche Bank (Deutsche Bank, Securities and Exchange Commission Form 20-F (March 23, 2006) at 105).  The facts and circumstances of that investigation had already been publicly recorded before Deutsche Bank's public filing.  Lynnley Browning, *Legal Costs of Shelter Case Hurt Deutsche Bank Profit*, N.Y. Times, Mar. 10, 2006, section C, available at 2006 WLNR 4023358; Lynnley Browning, *Deutsche Bank Said to Seek Settlement on Tax Shelters*, N.Y. Times, Feb. 24,2006, section C, available at 2006 WLNR 3195492.

they lacked standing to bring their claims of common law fraud, civil conspiracy, and violation of the Texas Securities Act ("TSA").  Their rights regarding the Notes were derived from and flowed through Prudential, the initial owner, which had purchased them from Enron in May 2001 after unwinding a previous Enron-related transaction.  The cover of each of the two Note purchase agreements at issue states in bold lettering, "This Note Agreement contains restrictions on transfer (Section 2.05)."  Section 2.05 provides that Prudential may not sell the Notes and the rights attached to them (including the right to bring this litigation) without first offering to sell the Notes at the proposed price to Enron (the "Right of First Refusal").  #38, Exs. 1-2.  Because of Enron's Right of First Refusal, on December 19, 2001, after Enron had filed for bankruptcy, Bear Stearns and Prudential signed only a Participation Agreement giving Bear Stearns a 100% "participation interest" in Prudential's Notes.  *Id.*, Exs. 4-5. On that same day, current Plaintiffs (which are special-purpose entities formed by The Baupost Group, LLC ("Baupost") and King Street Capital, L.P. ("King Street"), distressed debt investors and sophisticated arbitrage players, obtained 56% sub-participation interests from Bear Stearns.  On December 21, 2001 Baupost purchased a 56% sub-participation interest in the participation interest owned by Bears Stearns (*id.* at Ex.8), and on December 21, 2001, an additional 22% participation interest. King Street purchased a 12% sub-participation interest from Bear Stearns on February 6, 2002, at which point they owned 100% of the

participation interests in the Notes.   Baupost and King Street Capital then created their wholly-owned Ravenswood Capital and Whitewood Holdings entities, now Plaintiffs in the instant suit, and transferred the sub-participation interests, including the right to bring suit, to them.

The Financial Institution Defendants maintain that thus Prudential was still the owner of record of the Notes when proofs of claim to the Enron estate were due almost a year later.[9] Therefore on October 10, 2002 it was Prudential that filed the related proofs of claim in the Enron bankruptcy proceeding and stated that it owned the Notes.  *In re Enron Corp.*, Case No. 01-16034 (AJG)(Bankr. S.D.N.Y.)(Claim Nos. 8611 and 8621).

In November 2004 Plaintiffs asked Prudential as the owner of the Notes to participate in bringing this lawsuit, but Prudential refused.  *Ravenswood*, #38, Ex. 13 (Herbert S. Wagner, III, Tr. 198-202).[10]  Since the last of the relevant statutes of limitations

---

[9] Plaintiffs claim that on December 19, 2001, Prudential transferred its interest and all of its rights, including its claims against Defendants and 100% beneficial interest in both Notes by the Participation Agreement, to Bear Stearns. Participation Agreements §§ 1, 2, and 5, attached to #38, Exs. 4 and 5.  Plaintiffs insist that under section 7.06 in each Note Agreement, Prudential had the right to create participations relating to the Notes, that it did not limit what terms or conditions could be included in any participation agreement, that Prudential had "sole and absolute discretion" in creating the terms and conditions of any participation agreement and could grant any participation that amounted to at least $100,000, and that Prudential did not need Enron's permission to do so.

[10] As will be discussed, the transcript relates to Defendants' Rule 12(b)(1) factual challenge to Plaintiffs' standing, and thus the Court's subject matter jurisdiction, and is therefore admissible on the motion to dismiss. *Irwin v. Veterans*

were expiring on November 30, 2004, Plaintiffs filed their Original Complaint (*id.,* #1), even though they were not the owners of the Notes. Subject to approval by the bankruptcy judge, on December 2, 2004 Enron agreed to waive its Right of First Refusal regarding the sale of the notes, though the waiver would not be effective for 10 days. #38, Ex. 3. On January 11, 2005 Prudential "sold, assigned and transferred" the Notes to Bear Stearns, and on February 18, 2005 Bear Stearns assigned the Notes to Plaintiffs. #23-1 (Declaration of Joseph B. Schmit in Support of Defendants' Motion to Dismiss). Therefore before February 18, 2005 Plaintiffs lacked standing to bring this suit.

On July 11, 2006 the Scheduling Order in *Newby*, controlling all consolidated and coordinated actions, was amended after the class certification in *Newby* was reversed; it required that those plaintiffs who wished to pursue their own separate actions and who wanted to amend their pleadings to file motions for leave to amend "within 30 days after filing their statement of election." *Newby*, #4848 at 3. Plaintiffs filed their First Amended Complaint on August 17, 2006, approximately nine months after the close of fact discovery, and Defendants moved to dismiss it on September 18, 2006.

---

*Admin.,* 874 F.2d 1092, 1096 (5th Cir. 1989); *In re Blue Water Endeavors, LLC,* Bankr. No. 08-10466, Adv. No. 10-1015, 2011 WL 52525, *3 (E.D. Tex. Jan. 6, 2011).

In addition, Plaintiffs claim they obtained their right to bring this action through an assignment. Defendants insist that as a matter of law, TSA claims are not assignable.

Moreover, because Plaintiffs were on inquiry notice of the Enron fraud by at least November 29, 2001, the Financial Institutions contend that the three-year statute of limitations for their TSA claim and common law fraud claim and the two-year statute of limitations for their civil conspiracy claim expired before they filed suit on November 30, 2004, and certainly by February 18, 2005 (the earliest that Plaintiffs could have acquired standing to bring this action).

Furthermore, insist Defendants, the proposed amendments, including 200 new pages and 500 new allegations, substantially prejudice them in cost and time in having to draft new motions to dismiss, especially in view of the delay in asserting new claims.

**D. Plaintiffs' Reply (Ex. to #58)**

Plaintiffs object to Defendants' new claim that Plaintiffs suffered no losses and insist it is an issue that should not be considered in a motion for leave to amend. Moreover arguments regarding standing, limitations, note holder rights, and assignment of TSA claims also should be decided on a motion to dismiss or other proper motions and should not be seen as establishing that amendment would be futile.

They reiterate their intent to clarify facts and theories first set out in the first Amended Complaint; they insist there are no additional theories of liability and thus any prejudice to

- 12 -

Defendants is minimized.   They further maintain that the new evidence that has come to light is to assure compliance with Federal Rule of Civil Procedure 9(b).

**E.   Court's Decision Regarding Amendment**

The Court agrees with Defendants that Plaintiffs have failed to show "good cause" to meet the requirements of Rule 16(b). Their delay and lack of diligence in requesting leave to amend are fully supported by the record, as discussed by Defendants. Accordingly the Court denies Plaintiffs' motion for leave to file another amended complaint and reviews the Financial Institutions' joint motion to dismiss the First Amended Complaint.

**II. Defendants' Joint Motion to Dismiss (#22)**

The threshold issue for the Court is whether Plaintiffs had standing to file this action on November 30, 2004, a question inextricably entangled with the alleged "assignment."  If not, did they or can they now cure that lack of standing or must the Court dismiss this case for lack of subject-matter jurisdiction.

Defendants contend that at the time this suit was filed by Plaintiffs, they lacked standing and were not the real parties in interest under Federal Rule of Civil Procedure 17(a) regarding the litigations rights relating to the Notes.  Nor, they argue, can Plaintiffs now cure the problem.   Thus the Court lacks jurisdiction over this suit.

**A.   Relevant Rules of Procedure**

"When a motion to dismiss for lack of jurisdiction 'is filed in conjunction with other Rule 12 motions, the court should

- 13 -

consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." *Crenshaw-Logal v. City of Abilene, Texas*, 2011 WL 3363872, *1 (5th Cir. 2011), *quoting Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001); *see also Randall D. Wolcott, MD, PA v. Sebelius*, 635 F.3d 757, 762 (5th Cir. Mar. 15, 2011); Fed. R. Civ. P. 12(h)(3).  If a complaint could be dismissed for both lack of jurisdiction and for failure to state a claim, "'the court should dismiss only on the jurisdictional ground under [Rule] 12(b)(1), without reaching the question of failure to state a claim under [Rule] 12(b)(6).'" *Crenshaw-Logal*, 2011 WL 3363872, *1, quoting Hitt v. City of Pasadena*, 561 F.2d 606, 608 (5th Cir. 1977).  The reasons behind this practice are to preclude courts from issuing advisory opinions and barring courts without jurisdiction "'from prematurely dismissing a case with prejudice.'".  *Id.*, *citing Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998), and *Ramming*, 281 F.3d at 161.

"Article III standing is a jurisdictional prerequisite." *Crenshaw-Logal*, 2011 WL 3363872, *2, citing Steel Co.,* 523 U.S. at 101, and *Xerox Corp. v. Glenmoora Corp.*, 888 F.2d 345, 350 (5th Cir. 1989).  If a plaintiff lacks standing to bring a claim, the Court lacks subject matter jurisdiction over the claim and dismissal under Federal Rule of Civil Procedure 12(b)(1) is appropriate.  *Whitmore v. Arkansas*, 495 U.S. 149, 154-55 (1990); *Chair King, Inc. v. Houston Cellular Corp.*, 131 F.3d 507, 509 (5th Cir. 1997).  The party seeking to invoke federal jurisdiction bears the burden of showing that standing existed at the time the

lawsuit was filed . *M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 708 (Tex. 2001); *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001); *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

In reviewing a motion under 12(b)(1) for lack of subject matter jurisdiction the court may consider (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981).

A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is characterized as either a "facial" attack, i.e., the allegations in the complaint are insufficient to invoke federal jurisdiction, or as a "factual" attack, i.e., the facts in the complaint supporting subject matter jurisdiction are questioned. *In re Blue Water Endeavors, LLC,* Bankr. No. 08-10466, Adv. No. 10-1015, 2011 WL 52525, *3 (E.D. Tex. Jan. 6, 2011), *citing Rodriguez v. Texas Comm'n of Arts*, 992 F. Supp. 876, 878-79 (N.D. Tex. 1998), *aff'd*, 199 F.3d 279 (5th Cir. 2000).  A facial attack happens when a defendant files a Rule 12(b)(1) motion without accompanying evidence. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981).  In a facial attack, allegations in the complaint are taken as true. *Blue Water*, 2011 WL 52525 at *3, *citing Saraw Partnership v. United States*, 67 F.3d 567, 569 (5th Cir. 1995).

If it is a factual attack, the Court may consider any evidence (affidavits, testimony, documents, etc.) submitted by the parties that is relevant to the issue of jurisdiction.  *Id.,* *citing Irwin v. Veterans Admin.*, 874 F.2d 1092, 1096 (5th Cir. 1989).  A defendant making a factual attack on a complaint may provide supporting affidavits, testimony or other admissible evidence.  *Patterson v. Weinberger*, 644 F.3d 521, 523 (5th Cir. 1981).  The plaintiff, to satisfy its burden of proof, may also submit evidence to show by a preponderance of the evidence that subject matter jurisdiction exists.  *Id*.  The court's consideration of such matters outside the pleadings does not convert the motion to one for summary judgment under Rule 56(c).  *Robinson*, 2008 WL 4692392 at *10, *citing Garcia*, 104 F.3d at 1261.  "Unlike in a facial attack where jurisdiction is determined upon the basis of allegations of the complaint, accepted as true[,] when a factual attack is made upon federal jurisdiction, no presumption of truthfulness attaches to the plaintiffs' jurisdictional allegations, and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.  In a factual attack, the plaintiffs have the burden of proving that federal jurisdiction does in fact exist."  *Evans v. Tubbe*, 657 F.2d 661, 663 (5th Cir. 1981).  In resolving a factual attack on subject matter jurisdiction under Rule 12(b)(1), the district court, which does not address the merits of

the suit,[11] has significant authority "'to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *Robinson v. Paulson*, No. H-06-4083, 2008 WL 4692392, *10 (S.D. Tex. Oct. 22, 2008), *quoting Garcia v. Copenhaver, Bell & Assocs.*, 104 F.3d 1256, 1261 (11th Cir. 1997), and *citing Clark v. Tarrant County*, 798 F.2d 736, 741 (5th Cir. 1986). Because the arguments relating to standing and real party in interest in this action rely on the documentary evidence attached to briefing of the motions to dismiss, they present a factual attack on jurisdiction.

"The standing doctrine has its origins in 'both constitutional limitations on federal court jurisdiction and

---

[11] As the court explained in *Taylor v. Dam*, 244 F. Supp. 2d 747, 753 (S.D. Tex. 2003),

> It is well settled that "a district court has broader power to decide its own right to hear the case than it has when the merits of the case are reached." [*Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.). *cert. denied*, 454 U.S. 897 (1981).] "Jurisdictional issues are for the court--not the jury--to decide, whether they hinge on legal or factual determinations. *Id.* To determine whether jurisdiction exists, the court will generally resolve any factual disputes from the pleadings and the affidavits submitted by the parties. *See Espinoza v. Missouri Pac. R.R. Co.*, 754 F.2d 1247, 1248 n.1 (5th Cir. 1985). The court may also conduct an evidentiary hearing and "may hear conflicting written and oral evidence and decide for itself the factual issues which determine jurisdiction." *Williamson*, 645 F.2d at 413; *see Menchaca v. Chrysler Credit Corp.*,613 F.2d 507, 511-12 (5th Cir.), *cert. denied*, 449 U.S. 953 . . . (1980).

prudential limitations on its exercise.'" *Ensley v. Cody Resources, Inc.*, 171 F.3d 315, 319 (5th Cir. 1999), *quoting O'Hair v. White*, 675 F.2d 680, 685 (5th Cir. 1982)(*en banc*), *quoting Warth v. Seldin*, 422 U.S. 490. 498 (1975).   In the constitutional aspect, the focus is on whether the plaintiff has alleged a "case or controversy" between himself and the defendants within the meaning of article III. *Warth v. Seldin*, 422 U.S. at 498.   To determine if a plaintiff has standing the court should examine whether the plaintiff has "'alleged such a personal stake in the outcome of the controversy,'" has suffered "'some threatened or actual injury resulting from the putative illegal action,'" as to warrant his invocation of federal-court jurisdiction and justify exercise of the court's remedial powers. *Id.* 498-99.  The minimum constitutional standing requirement to invoke Article III jurisdiction of a federal court is (1) injury-in-fact, i.e., an invasion of a legally protected right that is concrete and particularized and actual or imminent; (2) a causal connection between the injury and the conduct complained of, i.e., the injury has to be fairly traceable to the defendant's actions; and (3) a substantial likelihood that it will be redressed by a favorable decisions. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Ensley*, 171 F.3d at 319, *citing Raines v. Byrd*, 521 U.S. 811, 818 (1997), and *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).  On the other hand, judge-crafted prudential restrictions on justiciability encompass the general prohibition that "'a

plaintiff may not rest his claim to relief on the legal rights of third parties even if he has alleged injury sufficient to satisfy article III,'" but must assert his own legal rights and interests. *Id., citing O'Hair*, 675 F.2d 687; *Warth v. Seldin*, 422 U.S. at 499.

A plaintiff may obtain standing through an assignment of a cause of action. *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 773 (2000); *City of Houston v. Southern Elec. Services, Inc.*, No. 01-06-00180-CV, 2007 WL 1228549, *2 (Tex. App.--Houston [1st Dist.] Apr. 26, 2007), *citing State Farm Fire & Cas. Co. v. Gandy*, 925 S.W. 2d 696, 706 (Tex. 1996); *Tyree Organization, Ltd. v. Cashin Associates, P.C.*, 14 Misc. 3d 1220(A), 836 N.Y.S. 2d 490 (Table), No. 12361-05, 2007 WL 171906, *4 (N.Y. Sup. Jan. 22, 2007)("The assignee of a cause of action has standing to bring an action upon the cause of action in his own name."), citing General Obligations Law § 13-105 and Calamari & Perillo, *Law of Contracts* § 18.3 (4th Ed.).

**B. Discussion**

The key facts have been summarized by Defendants,  and supported by the documentary evidence attached to #38, in the discussion of the motion for leave to amend.

Plaintiffs claim that they have standing and are the real parties in interest by virtue of an assignment of complete ownership of the two Notes to them through the Sub-Participation Agreement with Bear Stearns, which had previously obtained the Notes from Prudential through Participation Agreements.

The Court agrees with Defendants that Plaintiffs lack standing and cannot now cure that deficiency and that this case must be dismissed.

Defendants have submitted the relevant documentation (Notes, Participation Agreements, Sub-Participation Agreements, deposition transcripts, and matters of public record) referenced in the complaint and the motions to dismiss, attached as Exhibits to #38 (Declaration of Joseph B. Schmit), admissible on a factual Rule 12(b)(1) attack.

The distinction between an assignment and a participation agreement is critical here, but obfuscated by Plaintiffs. Because each of the Notes and the Participation and Sub-Participation Agreements states that it is governed by New York law, the Court will construe the contracts accordingly, although there are no significant differences from Texas law. The agreements are construed by standard contract law, and no party here argues that the agreements are ambiguous.

"Under New York law, an assignment occurs only where the assignor retains no control over the funds, no authority to collect and no power to revoke." *TPZ Corp. v. Dabbs*, 25 A.D. 3d 787, 792, 808 N.Y.S. 2d 746, 751 (N.Y.A.D. 2 Dept. 2006), *citing Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F. Supp. 401, 413 (S.D.N.Y. 1994), *citing in turn Miller v. Wells Fargo Bank Intern. Corp.*, 540 F.2d 548, 558 (2d Cir. 1976). "An assignment at law contemplates 'a complete transfer of the entire interest of the assignor in the particular subject of assignment, whereby the

assignor is divested of all control over the thing assigned.'' *Miller*, 540 F.2d at 558, *quoting Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.*, 10 App. Div. 2d 372, 376, 199 N.Y.S. 2d 852, 855 (4th Dep. 1960)(To effect a valid assignment, the assignor must be "divested of all control over the thing assigned."). "'It is elementary ancient law that an assignee never stands in any better position than his assignor.'" *TPZ*, 25 A.D. 3d at 792, 808 N.Y.S. 2d at 751 (citation omitted).

Under New York law, "No particular words are necessary to effect an assignment; it is only required that there be a perfected transaction between the assignor and assignee, intended by those parties to vest in the assignee a present right in the things assigned." *Avalon, LLC v. Coronet Properties Co.*, 306 A.D. 2d 62, 62, 762 N.Y.S. 2d 48 (N.Y. Sup. Ct. 2003), *quoting Leon v. Martinez*,638 N.E. 2d 511 (N.Y. 1994). "Because an assignment is a present transfer of an existing right[,] . . . [t]he assignee of a cause of action has standing to bring an action upon the cause of action in his own name." *Tyree Organization, Ltd. v. Cashin Associates, P.C.*, 14 Misc. 3d 1220(A), 836 N.Y.S. 2d 490 (Table) (N.Y. Supp. 2007), citing General Obligations Law § 13-105  and Calamari & Perillo, *Law of Contracts* § 18.3 (4th Ed.).[12]

---

[12]   Texas law is similar.  Under Texas law, an "assignment" is the transfer of property or some right or interest from one person to another. *Lincoln General Ins. Co. v. U.S. Auto Ins. Services, Inc.*, ___ F. Supp. 2d ___, Civ. A. No. 3:10-CV-2307-B, 2011 WL 3652436, *6 (N.D. Tex. Aug. 11, 2011), *citing Univ. of Tex. Med. Branch v. Allan*, 777 S.W. 2d 450. 453 (Tex. App.--Houston [14[th] Dist.] 1989, no writ).  A claim or "chose in action" can be such a right or interest. *PPG Indus., Inc. v.*

When Prudential purchased the two Notes from Enron, it became a lender to and creditor of Enron, the borrower, as evidenced by the Notes, which are debt instruments.  As the  "lead lender" in the parlance of multiparty loan agreements, Prudential entered into Participation Agreements with Bear Stearns, which in turn entered into the Sub-Participation Agreement with Plaintiffs.  As the Court indicated above, Plaintiffs misrepresent the nature and substance of the Participation and Sub-Participation Agreements that they maintain transferred all of Prudential's interest to them.

*In re Autostyle Plastics, Inc. v. MascoTech*, 269 F.3d 726, 736 (6th Cir. 2001)(some citations omitted) provided a "brief overview of the concept of participation agreements":

> "A participation is not a loan.  To the contrary, a participation is a contractual arrangement between a lender and a third party whereby the third party, labeled a participant, provides funds to the lender . . . ." *Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F. Supp. 401, 407-08 (S.D.N.Y. 1994).  The lender, in turn, uses the funds from the participant to make loans to the borrower. *See id.* at 408. "The participant is not a lender to the borrower and has no contractual relationship with the borrower." *Ibid.*  The participant's only contractual relationship is with the lender; the participant has no ability to seek legal recourse against the borrower. . . .

---

*JMB/Houston Centers Partners, Ltd.*, 146 S.W. 3d 79, 87 & n.31 (Tex. 2004).  "An assignment functions as a contract between assignor and assignee and is therefor interpreted according to the law of contracts.  In a valid assignment, the assignee steps into the shoes of the assignor and is considered under the law to have suffered the same injury as the assignors and have the same ability to pursue the claims." *Southwestern Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W. 3d 909 (Tex. 2010)

*See also In re Okura & Co. (America)*, 249 B.R. 596, 608 (Bkrtcy. S.D.N.Y. 2000)("The Courts are generally in agreement that a transfer of an undivided interest and participation in the context of a true participation does not allow the participant to assert a claim against the borrower.")(and cases cited therein). Moreover, in participation agreements, which are a type of "multiple lending agreement," the rights of a creditor and participant are distinct: a loan participation "involves two independent, bilateral relationships:  the first between the borrower and the lead [creditor] and the second between the lead [creditor] and the participants. . . . As a general rule, the participants do not have privity of contract with the underlying borrower" and cannot assert a claim against the borrower; instead the participant looks solely to the creditor to satisfy claims because the participant has no contractual or other legal relationship with the borrower." *In re Okura*, 249 B.R. at 608-09. *See also* A.S. Pratt & Sons, *Loan Participation Agreements*, <u>Law of Lender Liability</u> ¶ 2.01[5] (updated through July 2011)("A loan participation agreement is an agreement in which (1) money is advanced by a participant to a lead lender; (2) the participant's right to repayment only arises when the lead lender is paid; (3) only the lead lender can seek legal recourse against the borrower; and (4) the [Participation Agreement] is evidence of the parties' true intentions."); Raymond T. Nimmer, *"True" Loan Participations*, 2 Com. Asset-Based Fin. § 9:9 (updated through September 2011)("The participant . . . does not generally acquire legal

title to [the] loan since the participants can only look to their lead bank for satisfaction of claims arising out of the transaction, and they are not themselves creditors of the borrower and so cannot assert creditor claims against the borrower. Rights of the participant . . . flow not from the participation relationship itself but from the express terms of the specific agreement."). Participants' remedies are limited to claims against the party that holds a note for their benefit, here Prudential, but not against the debtor. *Hibernia Nat'l Bank v. FDIC*, 733 F.2d 1403, 1407 (10th Cir. 1984).[13] Participants have no independent litigation rights of their own; sub-participants have even less than participants. *Id.; Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F. Supp. 401, 407-08 (S.D.N.Y. 1994); *In re Okura & Co. (America)*, 249 B.R. 596, 603-04, 608-09 (Bankr. S.D.N.Y. 2000).

In this case, Prudential, which bought the Notes (debt) from Enron, was a creditor of Enron, the borrower. Because participants (Bear Stearns and, subsequently, Plaintiffs) are not

---

[13] The Court notes that the Fifth Circuit is in accord: *Cadle Co. v. Neubauer*, 562 F.3d 369 (5th Cir. 2009)("A typical participation agreement provides that the participating bank has a right that is enforceable only against the lead bank and not directly against the debtor"), *citing Hibernia*, 733 F.2d at 1407, and J. Robert Stoll, *et al., Lenders That Serve as Indenture Trustees: A Commercial Banking Perspective,* in *Practicing Law Institute: Real Estate Law and Practice Courts Handbook Series* (1990)("Court uniformly have concluded that, where the borrower is not a party to the participation agreement, the participant in a typical participation agreement has no direct contractual relationship with, and does not have rights of a creditor against, the borrower."). *See also In re Drexel Burnham Lambert Group, Inc.*, 113 B.R. 830, 842-43 (Bkrtcy. S.D.N.Y. 1990)

creditors of Enron, only the lead creditor (Prudential) had the right to file proofs of claim in the borrower's bankruptcy proceeding because Prudential alone held the claims underlying the loan. *See In re Okura & Co. (America)*, 249 B.R. 596, 603-04, 608-09 (Bankr. S.D.N.Y. 2000)(since "'participants generally are not creditors of the borrower, any collections and filing of proofs of claim in bankruptcy should be made by the party to whom the underlying obligation is owed, namely the lead lender'"), *citing inter alia Mason & Dixon Lines, Inc. v. First Nat'l Bank of Boston*, 86 B.R. 476, 480 (M.D.N.C. 1988), *aff'd*, 883 F.2d 2 (4ᵗʰ Cir. 1989), and *In re Coronet Capital Co.*, 142 B.R. 78, 81 (Bankr. S.D.N.Y. 1992)("A true participation agreement is one that . . . only the lead can seek legal recourse against the borrower . . . ."). *See also Who May File Proof of Claim or Interest*, 3 Bankr. Desk Guide § 22:14 & nn. 9 and 10 (updated August 2011). That only Prudential could and did file proofs of claim in Enron's bankruptcy proceeding evidences that it had not transferred all of its interests in the Notes to Bear Stearns in the Participation Agreements. Thus there was no assignment under New York law.

Furthermore, "[s]ince a participation is, by its nature, contractual, the parties to a participation agreement may choose whatever terms they wish and the agreement will generally be enforced as to its terms." *Autostyle Plastics,* 269 F.3d at 736*, citing First Bank of WaKeeney v. Peoples State Bank*, 12 Kan. App. 2d 788, 758 P.2d 236, 238 (1988). According to the Participation Agreements, on December 19, 2001 Bears Stearns purchased not a

100% interest in Prudential's rights, as Plaintiffs represent, but a "100% **participation** interest" in Prudential's rights under or associated with the Notes, which entitled them to receive through Prudential some or all of the proceeds paid by Enron to the owner of the Notes under the terms of the Notes.  Bear Stearns did not own, and thus could not sell ownership of, the Notes or of the litigation rights under them to Plaintiffs, and therefore before this suit was filed Plaintiffs did not obtain from Bear Stearns standing to file a claim related to the Notes, as these rights remained with Prudential.  *Id.*

Moreover, as correctly pointed out by Defendants, under the terms of Prudential's Note Purchase Agreements with Enron (#38, Exs. 1-2) and given Enron's status in bankruptcy, for Bear Stearns to receive, as well subsequently to effect, an outright assignment of all of Prudential's ownership and rights required at least three acts:  a waiver by Enron of its right of first refusal (set out in section 2.05 of the Notes[14]) to purchase the Notes, approval

---

[14] Section 2.05, <u>Right of First Offer</u>, states in relevant part,

> In the event that any Noteholder (each an "Offering Noteholder") proposes to transfer, in any single or series of related transactions (a "RFO Proposed Transaction"), all or any portion of its Notes (including a percentage of a Note) then held by such Offering Noteholder (all or such percentage, the "Offered Notes") other than to one or more of such Offering Noteholder's Affiliates or to other Noteholders and their respective Affiliates, then such Offering Noteholder will deliver to the Company a written notice (an "Offer Notice"), which shall include the

- 26 -

of the Bankruptcy Court of any agreement Enron entered into, and execution of valid elevation letters by the parties to the participation agreement.  See also #38, Ex. 3, Letter Agreement dated October 25, 2004 between Enron and Prudential (stating that if Enron received consent and approval from the bankruptcy court, Enron would waive its right of first refusal), attached to the bankruptcy judge's order, signed on December 2, 2004.  There is no evidence showing that eiether of the last two "pre-conditions" occurred before November 30, 2004, when Plaintiffs filed this suit.  See also #38, Ex. 6 (Letter dated August 2, 2002 from Prudential to Bear Stearns indicating that it had unsuccessfully tried to have Enron and the unsecured creditors' committee in the Enron bankruptcy waive the provisions in each Note Agreement in order to effect an outright assignment).  Under the rules of contract construction included in maxims of contract construction under New York law, contracts must be construed so as to give effect to every provision in them.  *See, e.g., Software AG, Inc. v. Consist Solutions, Inc.*, No. 08 Civ. 389, 2008 WL 563449, *11 (S.D.N.Y. Feb. 21, 2008), *citing* 22 *N.Y. Jur. 2d Contracts* § 249 (2008).  As Defendants observe, Plaintiffs' reading of the

---

material terms of such RFO Proposed Transaction as of the date of the Offer Notice, which material terms shall include the aggregate principal amount of the Offered Notes and the proposed purchase price thereof.  Upon delivery of an Offer Notice, the Company shall have the right to purchase from the Offering Noteholder all, but no less than all, of the Offered Notes at such proposed purchase price . . . .

Agreements as outright assignments of the Notes and the rights under them would render the elevation provision "meaningless surplusage." #45 at 5.

Defendants correctly assert that none of the documents demonstrates any simple assignment or direct transaction or transfer of claims between Prudential and Plaintiffs, but instead Notes with coverings stating, and Participation and Sub-Participation Agreements with, express restrictions. The Participation Agreements between Prudential and Bear Stearns signed on December 19, 2001, under which Bear Stearns obtained a 100% "participation interest" in the two Notes and Prudential's rights associated with those Notes, contractually provided that all title and claims relating to the Note remained with and would be acted on by Prudential and that any **proceeds** of the participation collected by Prudential would be passed by Prudential onto the Participant Bear Stearns. #38, Exs. 4 and 5, at 1, 3, 5, 7, 9-10. Subsection 9 of each Participation Agreement states, "upon the request of either party hereto, each party shall use commercially reasonable efforts and take such actions as are necessary (including obtaining all necessary consents, if any) . . . to effect an outright assignment of the Participation to the Participant. . . . Upon the effective time of such Elevation, this Agreement shall be deemed to be an agreement for outright

sale and assignment of the Purchased Percentage of the Notes from Seller to Participant."  Exs. 4 and 5 at 13.[15]

Defendants point out that the Sub-Participation Agreement (#38, Ex. 7 at 12 ("Participant may not sell, assign or otherwise transfer . . . the Participation or any part thereof or interest therein without the prior written consent of the Seller

---

[15] "Elevation" refers to effecting an outright assignment of the participation to the participant.  Paragraph 9, identical in the two Participation Agreements (#38, Exs. 4 and 5) and the Sub-Participation Agreement (Ex. 7) provides in full,

> Subject to the terms and provisions of the Note Documents, and applicable law, upon the request of either party hereto, each party shall use commercially reasonable efforts and take such actions as are necessary (including obtaining all necessary consents, if any) at the expense of Participant, including the reasonable fees and expenses of Seller's attorneys, to effect an outright assignment of the Participation to the Participant (the "Elevation").  Upon the effective time of such Elevation this Agreement shall be deemed to be an agreement for an outright sale and assignment of the Purchased Percentage of the Notes from Seller to Participant and the terms and conditions hereof shall survive the Elevation and shall be construed accordingly, modified mutatis mutandis. . . .

 Plaintiffs unpersuasively argue that the elevation clauses in the participations, like Enron's right of first offer, are unrelated to the assignment and transfer of Prudential's claims, but relate only to changing the name of the registered owner of the Notes on Enron's books.  Therefore the claims that Enron's letter agreement with Prudential, dated October 25, 2004 and adopted by the Bankruptcy Court on December 2, 2004 (#38, Exhibit 3), in which Enron waived its right of first offer, has no bearing on Plaintiffs' ability to file suit.  They construe purpose of the provisions regarding right of first offer and elevation of the Notes to confirm that Enron need only be concerned about paying Prudential as the registered owner on its books up until the elevation takes place and the new owner of the Notes is registered with Enron.

[Prudential, here. . . Not withstanding the foregoing, Participant shall be entitled to transfer a subparticipation interest in the Participation, or any portion thereof . . . ]"), like the Participation Agreements between Prudential and Bear Stearns (#38, Exs. 4 and 5), distinguished between a **participation** interest and a possible later **assignment** of ownership from Bear Stearns, which could eventually occur upon elevation of Bear Stearns and subsequently of the Sub-Participants.  #38, Ex. 7 at 14.   Thus Baupost and King Street had only sub-participation interests in the Notes with indirect interests derived only through Bear Stearns, which in turn derived its participation interests only through Prudential.

As noted earlier, under the terms of Prudential's Note Purchase Agreements with Enron (#38, Exs. 1-2) and because Enron was in bankruptcy, for Bear Stearns to effect an "assignment," as opposed to a participation interest in the Notes, would require at least three acts: (1) that Enron waive its right of first refusal (§ 2.05 of each Note, #38 Exs. 1 and 2); (2) that the bankruptcy court approve that decision by Enron  (see #38, Ex. 3, Letter Agreement[16] dated October 25, 2004 between Enron and Prudential,[17] entered into on Nov. 3, 2004, showing the effort to seek approval

---

[16] As evidenced by the exhibit, this Letter was incorporated into a bankruptcy order, which is a matter of public record.

[17] The Letter Agreement stated that if Enron received consent and approval from the bankruptcy court, Enron would waive its right of first refusal.

from Bankruptcy Court for Enron's waiver of its right of first refusal regarding sale of Notes); and (3) that the parties execute the requisite elevation agreements to trigger new, outright ownership of the Notes and of the fraud claims that originally were owned by Prudential. As the documents evidence, Enron's waiver of its right to first refusal was not effective until December 12, 2004, ten days after the bankruptcy court approved that agreement on December 2, 2004 (*id.*), according to the terms of the letter agreement (#38, Ex. 3, Order of Judge Gonzalez, dated December 2, 2004) and court rules. *Id.* Plaintiffs still could not obtain ownership until Bear Stearns obtained ownership of the claims and transferred those rights to Plaintiffs (#23, Ex. 1, Feb. 18, 2005, assignment of Notes by Bear Stearns to Plaintiffs). Thus the Court finds that, owning only indirect sub-participation interests in Prudential's rights or claims related to the Notes, not assignments or ownership, Plaintiffs without standing filed their original complaint on November 30, 2004, before approval of Enron's waiver by the bankruptcy court and before the elevation of Bear Stearns as owner.

Furthermore Defendants insist, and the Court agrees, that Plaintiffs' lack of standing when they filed suit on November 30, 2004 cannot be cured.

Federal Rule of Civil Procedure 17(a)(1) requires that an action "must be prosecuted in the name of the real party in interest." "The real party in interest is the person holding the substantive right sought to be enforced, and not necessarily the

person who will ultimately benefit from the recovery." *Wieburg v. GTE Southwest Inc.*, 272 F.3d 302, 306 (5th Cir. 2001).  A plaintiff that does not possess a right under the substantive law is not the real party in interest with respect to that right and may not assert it.  *United States v. 936.71 Acres of Land*, 418 F.2d 551, 556 (5th Cir. 1969).  The purpose of § 17(a) is "'to assure a defendant that a judgment will be final and that res judicata will protect it from having to twice defend an action, once against an ultimate beneficiary of a right and then against the actual holder of the substantive right."  *Wieburg*, 272 F.3d at 306.[18]

_____

[18] *Wieburg v. GTE Southwest, Inc.*, 272 F.3d 302 (5th Cir. 2001) addresses what then was Fed. R. Civ. P. 17(a)("No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest."), but today is Fed. R. of Civ. P.17(a)(3)("The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.").

In *Wieburg* the Fifth Circuit explained that "[a]ccording to the Advisory Committee's Notes, this provision was added 'simply in the interests of justice' and 'is intended to prevent forfeiture when the determination of the proper party to sue is difficult or when an understandable mistake has been made.'"). *Wieburg*, 272 F.3d at 308, citing Advisory Committee Notes, 1966 Amendment.  It noted that "most courts have interpreted" the sentence to apply "only when the plaintiff brought the action in her own name as a result of an understandable mistake, because the determination of the correct party to bring the action is difficult."  *Id., citing Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997)(district court retains discretion to dismiss action where there was no reasonable basis for naming incorrect party), and *Feist v. Consolidated Freightways Corp.*, 100 F. Supp. 2d 273, 276 (E.D. Pa. 1999)("Rule 17(a) should not be applied blindly to permit substitution of the real party in interest in every case.  In order to substitute the trustee as the real party in interest, Plaintiff must first establish that when he brought this action in his own name, he did

Nevertheless the current version of what was Fed. R. Civ. P. 17(a) when *Wieburg* was issued, now Rule 17(a)(3). provides,

> The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.  After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

The Advisory Committee Notes to the 1966 Amendment of Rule 17 indicate that this provision was added in the interests of justice and "is intended to prevent forfeiture when the determination of the proper party to sue is difficult or when an understandable mistake has been made."[19]   *Wieburg*, 272 F.3d at 308; *Delor v.*

---

so as the result of an honest and understandable mistake."). *See also Triple Tee Golf, Inc, v. Nike, Inc.*, No. 4:04-CV-302-A, 2007 WL 4260489, *25 (N.D. Tex. Aug. 10, 2007)(Under *Wieburg*'s "standard for determining whether the court should order a substitution of parties under 17(a) at a plaintiff's request . . . the factors to be addressed are whether the plaintiff acted within a reasonable time after becoming aware of defendant's objection to the plaintiff's right to pursue the action or whether the plaintiff's pursuit of the action in its own name was the result of any understandable mistake."), *aff'd*, 281 Fed. Appx. 368 (5th Cir. June 11, 2008). *See also Del Re v. Prudential Lines, Inc.*, 669 F.2d 93, 96 (2d Cir. 1982)("The purpose of this 'exception' to the requirement that all actions be prosecuted in the name of the real party in interest is . . . to avoid forfeiture in situations in which it is unclear at the time the action is filed who had the right to sue and it is subsequently determined that the right belonged to a party other than the party that instituted the action."), *citing* C. Wright & A. Miller, *Federal Practice & Proc.* § 1555 at 707-08.

[19] The general rule is that a plaintiff who lacks standing may not amend a complaint to substitute a new plaintiff to cure a lack of jurisdiction because a plaintiff may not create jurisdiction by amendment where none exists. *Summit Office Park, Inc. v. U.S. Steel Corp.*, 639 F.2d 1278, 1282 (5th Cir. 1981).  In addition generally a plaintiff cannot rely on amendment under Federal Rule of Civil Procedure 15 "to substitute a new plaintiff

*Intercosmos Media Group, Inc.*, 232 F.R.D. 562, 566–67 (E.D. La. 2005).   The Fifth Circuit has observed that most courts have decided that the last sentence of Rule 17 applies only where "the plaintiff brought [its] suit in [its] own name as the result of an understandable mistake, because the determination of the correct party to bring the action is difficult."   *Id., citing Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997)(district court retains discretion to dismiss action where there was no reasonable basis for naming incorrect party"), and *Feist v. Consolidated Freightways Corp.*, 100 F. Supp. 2d 273, 276 (E.D. Pa. 1999)("Rule 17(a) should not be applied blindly to permit the real party in interest in every case.   In order to substitute the [bankruptcy] trustee as the real party in interest, Plaintiff must first establish that when he brought this action in his own name, he did so as the result of an honest and understandable mistake."), *aff'd*, 216 F.3d 1075 (3d Cir. 2000), *cert. denied*, 532 U.S. 920 (2001).   *See also Magallon v. Livingston*, 453 F.3d 268, 273 (5th Cir. 2006)("In accord with advisory committee notes, our case law has put a gloss on Rule

---

in order to cure the lack of subject matter jurisdiction." *Federal Recovery Services, Inc. v. United States*, 72 F.3d 447, 453 (5th Cir. 1995).   Nevertheless, as discussed herein, under certain circumstances courts have permitted later substitutions to avoid forfeiture and injustice on the grounds that Federal Rule of Civil Procedure 17(a)(3), alone or in conjunction with the liberal relation-back provision in Rule 15(c), permits later substitution of the real party in interest for a plaintiff that is not, in order to relate back to the time when the original action was filed.   6A Wright, *et al., Federal Practice and Procedure* § 1555 (3d ed. 2011 update).

17's unqualified language.  It holds that a plaintiff must have a reasonable basis for naming the wrong party to be entitled to ratification, joinder, or substitution" and must "allow[] a reasonable time[20] for ratification, joinder, or substitution."[21]

_____

[20] "What constitutes a reasonable time is a matter of judicial discretion and will depend upon the facts of each case. Of course, counsel always is advised to proceed with dispatch." 6A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 1555 (3d ed. 2011 update)(footnote omitted).  *See id.* n.18, citing, as an example of unreasonable time, *Consul General of Republic of Indonesia v. Bill's Rentals, Inc.*, 330 F.3d 1041 (8th Cir. 2003), in which

> Consul General of the Republic of Indonesia was not entitled to a reasonable time to be appointed as a personal representative for deceased students and to amend the complaint to reflect the appointment, for purposes of wrongful-death claims brought to recover for the deaths of four students who were killed in a motor-vehicle accident when the consul general was aware of the objection concerning his real-party-in interest status at least eighteen months prior to the district court's ruling on the issue, and during that time he had ample opportunity to open the estates for the deceased students and be appointed as the personal representative but chose not to do so.

In *Wieburg v. GTE Southwest Inc. (Wieburg II")*, 71 Fed. Appx. 440, *3 (5th Cir. June 2, 2003), the Fifth Circuit found, "Seven months is more than reasonable, especially after Wieburg fully demonstrated her intent not to surrender control of this suit."

[21] *See also* 6A Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 1555 (3d ed. 2011 update)(footnotes omitted):

> A literal interpretation of Rule 17(a)(3) would make it applicable to every case in which an inappropriate plaintiff had been named.  However, the rule should be applied only to cases in which substitution of the real party in interest is necessary to avoid injustice.  Thus, it has been held that when

In *Wieburg*, the Fifth Circuit found that the district judge had

> the determination of the right party to bring
> the action was not difficult and when no
> excusable mistake had been made, then Rule
> 17(a)(3) is not applicable and the action
> should be dismissed.

In *id.* n.13, Wright, *et al.,* cite *Gardner v. State Fire and Cas. Co.,* 544 F.3d 553 (3d Cir. 2008)(assignment of owner's claims against insurer to tenant after statute of limitations has run was not the result of an understandable mistake and was ineffective).

Relevant to the situation in the instant case, the Ninth Circuit has held that Rule 17(a) does not apply where a party knows that it has no cause of action, but brings a suit to toll the statute of limitations while it tries to obtain an assignment from the real party in interest. *Nat'l Housing Exchange, Inc. v. Villarrubia,* Civ. A. No. 95-3745, 1997 WL 222521, *4 (E.D. La. May 2, 1997), *citing United States ex rel. Wulff v. CMA, Inc.,* 890 F.2d 1070, 1074-75 (9th Cir. 1989)(holding that "Rule 17(a) does apply where a party, knowing that it has no cause of action, brings a lawsuit to toll the limitations period while it attempts to obtain an assignment from the real party in interest). In *Wulff,* 890 F. 2d at 1074-75, because the Wulffs did not have a Miller Act claim on which they could sue at the time they filed their original complaint, but obtained one from the subcontractor B&K through assignment after the statute of limitations had run, the supplemental pleading in which the Wulffs alleged the assignment did not relate back to the original complaint. "The Wulffs' persistent efforts to obtain an assignment [of the claim], efforts which were eventually successful-though untimely-show that the Wulffs were aware that B&K was the real party in interest" and "there was no difficulty and no mistake in determining who was the proper party to bring suit.").

Other courts have held that an assignee can pursue the action if the assignment occurs before trial and the defendant is not prejudiced. *See, e.g., Dubuque Stone Products Co. v. Fred L. Gray Co.,* 356 F. 2d 718, 724 (8th Cir, 1966), and *Kilbourn v. Western Sur. Co.,* 187 F.2d 567, 571 (10th Cir. 1951). Two district courts in this Circuit have followed *Dubuque. Decorative Center of Houston, L.P. v. Direct Response Publications, Inc.,* 264 F.Supp. 2d 535, 544 (S.D. Tex. 2003), and *Lehman Brothers Holdings, Inc, v. Cornerstone Mortg, Co.,* No. Civ. A. H-09-0672. 2011 WL 649139, *11 (S.D. Tex. Feb. 10, 2011).

Because the issue is undecided, the Court will not apply the *Dubuque* rule, but will follow the Fifth Circuit's rulings in the *Wieburg* case.

abused his discretion under Rule 17(a) in dismissing plaintiff's claims after he found that the plaintiff lacked standing to raise pre-bankruptcy petition claims because the judge failed to explain why less drastic alternatives of allowing an opportunity for ratification, joinder or substitution by the bankruptcy Trustee were not appropriate.  272 F.3d at 309.  On remand the district court pointed to plaintiff's failure to disclose the claims at issue in her bankruptcy, that she had had reasonable time after the standing issue was raised to get the Trustee to join or ratify her claims in the action or substitute the Trustee, and that there was minimal impact on her creditors. *Wieburg v. GTE Southwest, Inc.*, No. 3:98-CV-2057-R, 2002 WL 311, 56431 (N.D. Tex. Sept. 26, 2002).  The Fifth Circuit then affirmed the district court's decision to dismiss the case. *Wieburg*, 71 Fed. Appx. 440 (5th Cir. June 2, 2003).

In this litigation Plaintiffs brought claims they knew they had no right to bring.  For more than three years following Enron's bankruptcy, Prudential exercised all rights relating to the Notes and claims under them in Enron's bankruptcy proceedings, as Plaintiffs were aware, so Plaintiffs knew that they were not legal holders of such claims.  As noted, in November 2004 Plaintiffs asked Prudential as the owner of the Notes to join them in bringing this lawsuit, but Prudential refused.  #38, Ex. 13 (Herbert S. Wagner, III, Tr. 198-202).  Thus they did not make an honest or "understandable mistake" under Rule 17 that the Court

- 37 -

should allow to be remedied subsequently.  Nor have they argued that Prudential ratified, joined, or substituted into the lawsuit.

In filing the instant action when at most they had a sub-participation interest, not an ownership interest, Plaintiffs knowingly asserted the legal rights still belonging to Prudential in order to avoid the statute of limitations bar.  Nor have they yet shown that they have since acquired an ownership interest in the Notes.  The delay was not due to an "understandable" "mistake" and Plaintiffs cannot now cure the problem, substitute in, and pursue the suit.

Moreover it is impermissible for a party not the real person in interest to file suit to avoid the statute of limitations. *United States ex rel. Wulff v. CMA, Inc.*, 890 F.2d 1070, 1075 (9th Cir. 1989)("Rule 17(a) does not apply to a situation where a party with no cause of action files a lawsuit to toll the statute of limitations and later obtains a cause of action through assignment.  Rule 17(a) is the codification of the salutary principle that an action should not be forfeited because of an honest mistake; it is not a provision to be distorted by parties to circumvent the limitations period."), *clarified*, *Mutuelles Unies v, Kroll & Linstrom*, 957 F.2d 707, 712 (9th Cir. 1992)(trial court must accept ratification by a real party in interest; ratification requires that the ratifying party first authorize continuation of the action and second agree to be bound by the result of the lawsuit), *construed, In re Hashim*, 379 B.R. 912, 924 (9th Cir. 2007).  *In accord, Tyler House Apts., Ltd. v. U.S.*, 38

Fed. Cl. 1 (Fed. Cl. 1997). 6A Wright & Miller, *Federal Practice & Proc.* § 1555 ("A literal interpretation of Rule 17(a)(3) would make it applicable to every case in which an inappropriate plaintiff has been named. However the rule should be applied only to cases in which substitution of the real party in interest is necessary to avoid injustice. Thus it has been held that when the determination of the right party to bring the action was not difficult and when no excusable mistake has been made, then Rule 17(a)(3) is not applicable and the action should be dismissed.").

Accordingly, for these reasons the Court

ORDERS that Plaintiffs' motion for leave to amend (#55) is DENIED and Defendants' joint motion to dismiss (#22) is GRANTED for lack of subject matter jurisdiction under Rule 12(b)(1). Thus the Court

ORDERS that this action is DISMISSED without prejudice.

**SIGNED** at Houston, Texas, this  29th  day of  November , 2011.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

- 39 -